IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

vs. No. 1:13-CR-00966-JCH-KK

CHANNON, et al.

# TRANSCRIPT OF PROCEEDINGS

SENTENCING

October 20, 2016

BEFORE: HONORABLE JUDGE JUDITH HERRERA
UNITED STATES DISTRICT JUDGE

Proceedings reported by stenotype.

Transcript produced by computer-aided transcription.

A P P E A R A N C E S:

| | |
|---|---|
| FOR THE PLAINTIFF: | HOLLAND SERGENT KASTRIN<br>holland.s.kastrin@usdoj.gov<br>MARGARET VIERBUCHEN<br>margaret.vierbuchen3@usdoj.gov<br>C. PAIGE MESSEC<br>paige.messec@usdoj.gov<br>Office of the U.S. Attorney<br>201 Third Street, Northwest #900<br>Albuquerque, New Mexico 87103<br>505-346-7274 |
| FOR DEFENDANT BRANDI CHANNON: | TODD BRUCE HOTCHKISS<br>www.nmcriminallawyer.com<br>Todd B. Hotchkiss Attorney At Law LLC<br>610 Gold Avenue, Southwest, #228<br>Albuquerque, New Mexico 8710.<br>505-917-3925 |
| FOR DEFENDANT MATTHEW CHANNON: | JOHN F. ROBBENHAAR<br>john_robbenhaar@fd.org<br>MARC H. ROBERT<br>marc_robert@fd.org<br>Office of the Federal Public Defender<br>111 Lomas Boulevard, Northwest, #105<br>Albuquerque, New Mexico 87102<br>505-346-2489 |

THE COURT: Please be seated. Good morning to everyone.

We are on the record in USA versus Channon, Case Number 13-CR-966.

And good morning to all of you.

MS. MESSEC: Good morning, Your Honor.

THE COURT: And you have Mr. Moon with you?

MS. MESSEC: I'm sorry.

Paige Messec for the United States; Jeffrey Moon, of the FBI; Holland Kastrin and Margaret Vierbuchen of my office.

THE COURT: Good morning.

MR. ROBERT: Good morning, Your Honor.

Marc Robert on behalf of Matt Channon.

Here with me is cocounsel, John Robbenhaar; and Stephanie Porter, my paralegal.

And of course Mr. Channon is present.

MR. HOTCHKISS: Good morning, Your Honor. Todd Hotchkiss on behalf of Brandi Channon, who is present.

THE COURT: Good morning to all of you as well.

Well, we're here today to conclude the sentencing hearing that we began late last month.

I thought that perhaps the most efficient

way to handle this -- I should say that I have reviewed the papers that you-all submitted.

I know that there was a motion asking for leave of the Court to submit some additional argument based on the defendants' summation.

My recollection -- and I guess I should have looked at the transcript. But my recollection is that I told you-all that you would simultaneously do your written submissions, and if anybody had anything they wanted to say with respect to the other side's submissions, that you would have that opportunity to make that record orally, so I'm not inclined to take any additional briefing on that issue.

But I would expect that anything that you have to say about what was submitted by the defendants is something that I can hear today.

So with that, my suggestion is that we proceed with any argument you-all would like to make on any issue, whether it's a matter that we addressed at the -- at the beginning portion of our sentencing hearing, the evidentiary hearing, or anything else.

I -- my preference would be to just have one portion of the hearing today as the attorneys addressing the Court on whatever you want to address,

and then I can proceed to the more -- to the -- to hear from the defendants and then pronounce sentence, if that works for you.

What I'm trying to avoid is having multiple arguments. That's what I'm really trying to avoid.

Ms. Messec?

MS. MESSEC: I would like to do it -- to address any objections to the PSR, things that affect the guideline calculation --

THE COURT: Right.

MS. MESSEC: -- before offering the government's closing remarks as to what the ultimate sentence should be imposed is. It just seems those are discrete issues upfront.

I don't have a lot to add, other than -- to those -- to the PSR or guideline or number calculating kind of issues, other than things that I would say that were attached in the proposed response. That's about all I have to add to those issues.

THE COURT: Well, let me -- I really would rather hear whatever you-all have to say once, and so that's what I'm trying to accomplish.

What I generally do, once I get to the sentencing, the actual sentencing piece, is I usually

tell you what I'm contemplating in terms of a potential sentence or in terms of you -- I guess what you're saying is you want to know how I'm going to rule on the objections.

Whatever I tell you my ruling is is going to have an impact on what you're going to request from the Court.

Is that what you're --

MS. MESSEC: That's right, it does. Our arguments depend on things that haven't been resolved yet. And so most of what I plan to say this morning has to do with the ultimate sentence, but there are just a few discrete issues that I would like to put on the record about the evidentiary hearing and new arguments the defendant raised that weren't related to the evidentiary hearing, but that are more properly categorized as objections to the PSR.

THE COURT: Okay. Do you have any comment on how -- what -- how you envision this proceeding?

MR. ROBERT: No, Your Honor. I disagree with the government's characterization of our discussion of forfeiture.

But, no, I have no problem in dealing with -- I guess what I would say is that a great deal of what needs to be said has already been said in

writing, and I don't intend to spend a ton of time rehashing those things. Obviously, I'm going to respond to whatever the government argues, and I guess we'll hear something.

But we've seen the proposed response that was filed with the motion, so I guess I kind of know what's coming on that, and we do have some things to say on that.

But beyond that, I think most of the issues that have been raised have been addressed in writing to some extent. So I don't have an intent to spend hours talking about it again.

THE COURT: All right. Well, I did set aside the morning for this, so it's not like we don't have sufficient time to address all of these issues.

So if you want to take up the objections first we can do that.

But I -- I have reviewed everything, and so I don't really feel like -- except for you wanting to put things on the record, I don't know that we need to spend a whole lot of time on it.

But you may proceed.

MS. MESSEC: You know, I would agree, Your Honor. The only things I want to put on the record are the things that I have proposed to say in

response to defendants' summation, the attachment to my motion to respond.

If the Court has already read those, then I -- I don't see the point of essentially summarizing them here. But if that would be helpful to the Court to have them on the record, then I would be happy to do that.

I wanted to make sure that the Court had our position on things like whether guideline intended loss can include unlikely or impossible to occur losses, those types of objections. This is our first time to respond to them, and if I don't say them here, then they're not on the record.

But I also don't want to --

THE COURT: You're free to make your record. You can say whatever you'd like to say.

As I said a moment ago, I did set aside the rest of the morning for this, so I feel like we have time to take up whatever you need to take up.

I have reviewed what you-all have submitted, so -- but please feel free to make any argument you would like to make.

MS. MESSEC: All right. Then I would like just to briefly respond to some of the issues the defendants have raised for the first time in their

summation after the evidentiary hearing a couple of weeks ago.

One of the issues the defendants raise is that they claim that the intended loss figure cannot include losses that were not possible because OfficeMax had shut down their accounts in the middle of their scheme.

They cite a case, Entsminger, from the Tenth Circuit from 1999 for this proposition. But Entsminger has been overruled by the sentencing commission's amendments to the guidelines in 2001, which were explicitly amended to reject approaches like that of the Tenth Circuit, which had held that unlikely or impossible to occur losses couldn't be included in intended loss.

The sentencing commission said that including those types of losses was a better measurement of the defendants' culpability than not including them.

So those kind of losses -- if the United States has proved the defendants intended to inflict, even if they weren't possible to inflict because their fraud had been discovered, are properly included in the guideline range.

The defendants have also suggested that the

Court cannot include the -- in the intended -- or that the Court must include the intended loss calculation, all the profits that they supposedly believed that they were delivering to OfficeMax.

I don't think the defendants have presented any evidence on which the Court could draw a conclusion that they intended to deliver profits to OfficeMax.

In fact, the record shows that they went to great lengths to hide what they were doing from OfficeMax. They used fictitious activities for their accounts, they traveled to hundreds of stores all across the country. This isn't the kind of behavior of people who thought that they were helping the company make a lot of money. It's the type of hiding that you do when you know that you're doing something wrong.

So I believe it's clear that they purposefully sought to inflict pecuniary harm on OfficeMax. Not because they had it out for the company, but because they had to inflict that harm in order to get the gain for themselves.

So I believe that it's entirely possible and proper for the Court to consider, in the intended loss, amounts that the Channons intended to cause and

harm to OfficeMax without including any offset for credits for any profits that they wrongfully believed OfficeMax would be redeemed through their fraud.

The defendants have also addressed the forfeiture amount in their summation. They have claimed the United States has not provided any basis for tracing the proceeds of the offense to the sum of money that we're seeking through the money judgment.

The money judgment, however, does not have to be traced to the proceeds of criminal activity. It represents the amount of property or money that the defendants received as -- as the gains from their criminal activity.

Under Rule 32.2 of the Federal Rules of Criminal Procedure, the Court only needs to establish the amount that the defendant is ordered to pay. It's only when the government is seeking the forfeiture of specific property that the Court has to determine the nexus.

The defendants have -- what defendants are suggesting would go against the purpose of money judgments and forfeiture, which is to make sure that the defendant doesn't get off easy for being able to dissipate or hide part of the proceeds so that the government can't find them.

And there should be no distinction between a defendant who takes his proceeds as a sum of cash and a defendant who takes them in some other valuable form, as property, and then puts that property out of reach of the government.

The United States is seeking a money judgment. We believe that we're entitled to one under the law. But even if we were not to receive a money judgment, that doesn't mean that forfeiture wouldn't be appropriate at all. The United States would still be entitled to the forfeiture of the property that the government -- or that the defendants received as a result of their fraud from OfficeMax. And the value of that property is $105,191.

I want to make it clear that the government is not seeking forfeiture of any items that were found in the Channons' home. Those are evidence in the case. They may ask for that evidence back when the case is concluded.

They've also objected that the United States has not come up with a number, quantified the rewards that were sold to third parties over the internet or the value that the Channons have received from them.

That's not true. The evidence at trial established that Matthew Channon sold 67 separate MaxPerks reward certificates to buyers over the Internet. They had a face value of $2,302. This is in Trial Exhibit 84 and Trial Exhibit 129.

So those rewards are properly included in the forfeiture amount, as they were items of value that the Channons gained through their fraud.

But even if the Court were to accept the defendants' argument that they should only be held liable for the forfeiture for the face value of those certificates, that's still $1,968, which is only a difference of $334 from the face value of those certificates.

Finally, they objected that the government had not shown that these third -- that rewards that were sold to third parties were actually redeemed at OfficeMax before including them in the forfeiture amount.

And again, that's a misunderstanding. All of the $105,191 included in the government's forfeiture amount are rewards that were redeemed at OfficeMax. That's how they get into the initial calculation in the first place. If they weren't redeemed, they wouldn't have even been in the total.

And so all of that forfeiture amount are rewards that were spent at OfficeMax.

Those are all of the points that I wanted to respond to from the defendants' summation following the evidentiary hearing, in addition to what we already submitted in our written summation.

THE COURT: All right.

Mr. Robert?

MR. ROBERT: Your Honor, I will basically stand on the summation that we filed, and I would like to address the notion that we've raised new issues.

And I think it was a matter of understanding. It was my understanding that the evidentiary hearing that we had was primarily to focus on the financial issues, which included the calculation of loss amount, what amount of restitution might be appropriate, and the amount of forfeiture, all of which can be different.

And so what the government is complaining about is essentially the same thing as saying, "Defense, when you file your Rule 29 motion at the close of the government's case it's not fair, because you didn't tell us before the Rule 29 motion that we failed to meet our burden of proof on a certain

issue."

It's the government's burden, of course, as to all of these matters. And the government had the burden to establish the amounts, for guideline sentencing purposes at least of the loss, and the amount of restitution appropriately paid to OfficeMax, now Office Depot, and the amount of forfeiture that was appropriately contemplated by the Court.

And it's our position that the government has almost completely failed its burden -- to meet its burden of proof with respect to at least the forfeiture issue.

And you've already heard, Your Honor, and I won't pound the lectern and repeat our arguments with respect to loss. I'll talk about that in a little bit, when we talk about the objections to the presentence report beyond what we discussed at the hearing and what's included in our summations on that, if that's how we're proceeding.

It sounds like we're breaking it up into first we're going to talk about the evidentiary hearing, the summations, and then, I guess...

THE COURT: What I thought we were doing was taking up the objections.

And I know Ms. Messec wanted to put on the record what I said she couldn't file, that the Court wouldn't accept, because the Court's intent was to take any argument on the summations here.

I'm not saying that this is all we're talking about right now. I'm saying we're taking up the objections first.

And the only thing that Ms. Messec wanted to address was what she did address, the -- respond to the things that she thought required placing on the record regarding your summation.

But I didn't understand that that's it. I mean, we're talking objections.

MR. ROBERT: That's fine. Then I'll -- okay.

As to the summation, yeah. Like I said, I mean, we had an evidentiary hearing. Our position on loss I'll talk about in a moment, in the context of the more -- of the original objections to the PSR.

But in terms of the forfeiture matter which the government, again, complains was a new issue, it's simply our argument that they had the opportunity at the evidentiary hearing to establish an evidential foundation for their claim of forfeiture. And it's our position that they failed

to meet that burden.

Ms. Messec has stood up here today and said, "Well, it shouldn't be okay for a defendant to conceal assets and be able to benefit from that bad conduct" when, in fact what's happening here is that the government has made no effort to do what the statutes -- there are five of them that address these issues -- require.

Mr. Channon has hidden nothing. He's not concealed any assets. The government's made no allegations other than the sort of allusion to that just a moment ago that there's been any intentional concealment of assets.

Instead, what's happened is that the statutes require things which we've laid out in our briefing on the forfeiture issue, and the government has failed to do those things. The government has had an opportunity to do the things that the statutes require in order to get forfeiture in the first place, and in order to get -- to follow the procedural steps that would allow them to get a money judgment, if that's even appropriate under the law, after considering what's happened.

And they've not done it. So I would turn it around and say, "Well, it's not appropriate for

the government to do nothing," as they've done on this issue, and then claim, "Well, the -- the defendant failed to tell us what we're supposed to do," and so it shouldn't be allowed to make the argument.

I think we've fairly succinctly laid out the various procedural complexities that are inherent in these forfeiture matters, combining as they do in civil and criminal statutes, from various sources -- various places in the US code, and discussed why forfeiture is inappropriate.

We will say that to the extent that the government has established an evidentiary basis for a total of $1,968, that comes from paragraph 9 on page 4 of the proposed response, that being an amount attributable to evidence at trial establishing a sale of 67 MaxPerks rewards certificates.

Beyond that, the government has utterly failed in its -- in meeting its burden of proof on the forfeiture issue, and we would ask the Court to order either no forfeiture or forfeiture in the amount of that number 1,968 -- 1,968.

All right. That's the forfeiture thing.

And again, I think the argument has been made, and we'll stand on our expression of what we

perceive the procedural requirements and procedural deficiency of the government's showing to be.

We have made a number of objections to the presentence report. Obviously the big one is loss, and that gets back to the evidentiary hearing that we had a couple of weeks ago.

And the bottom line, Your Honor, as we've said in our summation, is again, the government has the burden to prove these things and -- by a preponderance of the evidence in the Court's calculation, and it's our position that the government has failed its -- to meet its burden of proof to establish any loss, much less an intended loss in excess of $500,000 or an actual loss in excess of either -- it's either 105 or something over 96,000.

And the reason that we say that -- and this kind of goes to the heart of a number of issues that are raised in this case.

It was Mr. Channon's belief all along that this was going to be something that made money for him as well as for OfficeMax.

And the government can complain about that all it wants, but that's what was in his head. And one of the things that was presented at trial was

some of these reconditioned cartridges that were sold for between 30 and $50 apiece in packs of one.

And anybody can walk down the counter and look at this and say, "Okay. Well, wow. They're giving me $2 or $3 for each of these cartridges and they're selling them for 30, 40, 50 bucks. They're making money on this deal. This is a good deal for everybody."

Now, not conceding anything, because we -- you know, procedurally where we are is having been convicted at trial and facing an appeal, we're not in much of a position to talk about, you know, conceding facts or anything of that nature, just in case the matter gets reversed and comes back for a retrial.

So please understand our arguments and Mr. Channon's allocution in that context. There's things that he can't say because of the procedural posture of the case.

But what was in his mind at that time was, "This is a system that I can deconstruct and cleverly work to my advantage, and incidentally to their advantage, because they're making a bunch of money on reselling these cartridges.

Now, whether or not that's true -- I mean, we heard that the company made over $88 million on

its various recycling programs, some of which are relevant to this inquiry and some of which are not.

But what we're left with is a strong conviction that when they would sell recycled cartridges that they recovered back from Clover, whether they were those that were specifically fingerprinted to the Channons, they made money on that.

And you know that, of course, is consistent with what we know about Fortune 500 companies. They're in the business to make money. They're not in the business of giving things away free for nothing. And this is certainly an example of that.

They claimed during the trial, under oath and throughout this thing until just recently, that this was, "Oh, this was a money loser. We lost money on this. We only did it to engender customer loyalty."

When in fact, this was a program that made the company a significant amount of contribution to their bottom line on the income statement.

And so it wasn't just out of the goodness of their heart or a wish to cause warm fuzzies among their customers' thoughts of them, it was to do that, to engender customer loyalty, but it was also to make

money.

And it was certainly within the realm of likelihood that when Mr. Channon looked at what was hanging on the shelf that he recognized what turned out to be true, that this was a moneymaking proposition for the company.

And so that actually addresses a fundamental notion of intended loss. I mean, intended loss -- the government, you know, is suggesting by virtue of a couple of calculations that intended loss is simply that which could have been achieved. But I would argue to the Court that intended loss actually addresses what's going on in the defendant's mind, in Mr. Channon's mind in this case.

And to the extent that he did not see this as a money losing proposition; but, rather, as a win-win for both him and OfficeMax, there was no intent to cause any loss at all.

So intended loss, if you look at the notion of intent as being something that's focused on the actor, in this case Mr. Channon, then I think you have to consider the reality that that was not -- it was not within his contemplation, "I'm going to cost this company money."

No. It was in his contemplation that it was going to be a moneymaker to both him and for OfficeMax.

And so we're left with kind of an evidentiary void, except to the extent that we have evidence that we didn't have before, that we got after OfficeMax complied with at least 13 pages of documents in response to the subpoena, in which -- as a result of which we learned that there was this enormous profit that was made as a result of these programs, as was expressed by Ms. McHard in her testimony and the documents that we received and we provided to her that resulted in the generation of the report that we provided to the Court last month.

What then are we left with?

The government claims these losses, these actual losses, these intended losses. But in fact, we suggest that there are no losses at all.

Now the government says, "Oh, well, we don't know that those were the same cartridges that the Channons brought."

Well, that's technically true. It's also true that we don't know that they weren't. We do know that they collected these cartridges, packaged them up, sent them to Clover, bought some back, and

sold those at a profit.

Whether they were the same or not we don't know, but that's my point. Without knowing that they weren't, the government fails its evidentiary burden to establish that even as a result of this specific conduct, the government -- I mean the company lost -- lost money.

And as outrageous as it seems to me, that the government has brought the endless resources of the Department of Justice to bear in service of collecting a claimed debt by a Fortune 500 company, it's even more outrageous if there was no loss to that company at all and the government comes and asks for three hits:

One in determination of the offense level based on loss;

Two, amount of restitution that is essentially an amount to unjust enrichment to Office Depot, successor in interest to OfficeMax;

And, three, a forfeiture amount that would additionally cause the Channons, both of them, to be responsible for paying an amount based on loss that the government has failed to establish.

Now, I raise this as an objection to the presentence report because the loss calculation is

really critical to what we're talking about here. It's a plus 12 in the presentence report. So the base offense level is 7. There are two separate adjustments for leader, organizer, and use of specialized means, that bring the offense level to 11, but then a 12-level increase based on the loss amount.

So if there is no loss, or if, more specifically, the government has failed to -- to present adequate evidence to meet its burden of preponderance based -- to establish loss, then the offense level is 11.

If the Court accepts the calculation in the presentence report, then the offense level is 23.

Well, the sentencing range for an offense level of 11, Criminal History Category I, is 8 to 14 months.

For -- the presence report, though, establishes a sentencing range of -- I think it's 46 to 57 months. So that's almost a sixfold increase in the low end of the sentence.

So this loss determination, this arbitrary thing about which we've complained in our sentencing memorandum, virtually sextuples the low end of the guideline sentencing range. And we're asking for a

probation sentence for a lot of reasons.

But a practical matter, that result is a lot easier to reach if we're in an 8- to 14-month sentencing range as opposed to a 46- to 57-month sentencing range.

These things are all arbitrary. And one of the points that we made in the sentencing memorandum is the complaints -- the difficulties and the arbitrary way in which the sentencing commission has chosen to treat these things, and the criticisms of those approaches among judges and commentators alike.

But I think the most graphic problem that we have as a result of that loss calculation is that enormous difference in just -- in the calculation, the correct calculation of the guideline sentencing range between 8 to 14 months and 46 months to 57 months.

The -- well, I kind of want to talk about the 3553. This isn't necessarily so much an objection to the presentence report as it is -- it sort of relates the argument I'm just making to the Court's ultimate consideration of those factors.

And whether or not the Court concludes that the offense -- that the guidelines require the application of that 12-level increase, or some other

number that the Court might determine to be appropriate as a way of reaching the offense level under the guidelines, that's not the end of the inquiry, of course.

The Court gets to determine what the appropriate sentence is by considering a galaxy of factors that are well beyond the guidelines.

And I submit that one of the things that the Court should consider is that even if that's -- even if that's the correct number, it's a plus 12 under the guidelines, fine, 46 to 57.

But now let's take a look at the broader picture, the nature and circumstances of the offense, the history and characteristics of the defendant.

And -- and looking at the loss in a less technical, less arbitrary way, the claimed loss or the actual financial ramifications of this conduct, then we go back to the testimony that we heard last month.

And, well, we're not really sure whether a gain or a loss accrued from the conduct specifically attributable to the Channons. And maybe it reaches a preponderance standard, so for purposes of calculating the correct guideline sentencing range, maybe that's right.

And I don't agree with that, but maybe that's the Court's conclusion.

The broader contemplations of 3553(a) give you the opportunity to say, Wait a minute. That's not the end of the inquiry. There are some really fuzzy issues here with respect to whether or not there was a loss, whether or not something -- there's a basis for forfeiture. Whether or not, even though that might technically be correct under the guidelines, whether that's fair, whether that's the right thing to do.

And so, Your Honor, even if we lose on the guideline argument on the specific objection to the presentence report and the application of that plus 12, I submit that 3553(a) gives you the opportunity -- and we submit an obligation -- to look at this thing in a broader context and recognize that there's some real hard -- there's some real ambiguities here about whether or not they lost a dime on all of this.

And given those ambiguities it would be unjust, I think, to apply -- strictly adhere to the guidelines and -- if that's the correct calculation of the guidelines -- and impose sentence on the basis of that calculation.

That is the -- a number of other objections I think are less -- certainly less significant in terms of determining the sentence.

We objected to the inclusion of anything outside the realm of the allegations made in this case.

One of the things that happened during -- during the trial to some extent, and also during the evidentiary hearing, is the discussion of the claims of fraud or embezzlement by Mr. Scalamandre, who himself has quite a checkered past, a defendant in 19 civil lawsuits, and the defendant in a grand theft criminal case which was ultimately dismissed. But he certainly comes to this with a questionable background himself.

And you know a lot of this stuff, including the complaints of the Santa Fe couple that were allegedly aggrieved by things that Mr. Channon did in connection with his -- his solar company, there are two sides to the story.

And from Mr. Channon's perspective Scalamandre, and others that were investors in that project in Silicam, breached their agreements with him and the -- and stopped paying him for work that he was entitled to be paid for.

And so this is not an unambiguous situation. The government comes in and says, Look. He's this bad guy. He steals money from people.

No. That's not the way it was.

And then the thing that happened with respect to the solar company in Santa Fe, certainly those people were -- were angry about it. But what happened was that Mr. Channon installed a functioning solar system on top of their house. They later were contacted by a competitor --

MS. MESSEC: Your Honor, I object. This is not in the record.

THE COURT: I don't recall any testimony on this issue. I'll allow you to tell me about it.

I can tell you that I'm not making any findings on any of that conduct. So...

MR. ROBERT: Okay. Our objection was we don't want it considered. And if the Court's not going to consider it, I'll stop talking about it.

THE COURT: What I'm inclined to consider is that there were disputes that others had with Mr. Channon. But who's right and who's wrong and how it all shook out is not something that I'm prepared to decide.

So to the extent that I take any of that

conduct into consideration, it doesn't really add or subtract anything from my determination of an appropriate sentence.

MR. ROBERT: Okay. That's fair, and I appreciate that, Your Honor.

The only thing I would say, just in broad summary, is that there are two sides to all of these issues. And I don't -- I don't want to have a mini trial about these -- these various things.

But because of that, I don't -- I -- the objection is aimed at sort of not having that become part of the sentencing calculus, so I'll leave it at that.

One thing that I noted in the objections was to do with Mr. Channon's income. And the income that was attributed to him, I think, was accurate at the time at which the presentence interview took place, was substantial.

But I would point out to the Court that as Mr. Channon sits here today he is unemployed. And the way it works -- and it's interesting, because this -- what he's doing now and what he's done for the last couple of years to make money is not something that he was trained to do or had the ability to do until all of this stuff happened.

Mr. Channon, remarkably, trained himself to do the things that he does, write code for mobile phones, as I understand it, and does that on a contract basis. He's done it for a variety of folks who pay him on a contract basis.

And if he has a contract he gets paid -- or not. And if he doesn't, he doesn't. And that's the situation in which he finds himself at this moment.

Last month I think he was still working on a contract. This month he's not.

Obviously, the uncertainty of his immediate future somewhat plays into that. But I -- I guess I just want to point out to the Court that although Mr. Channon has made good money doing that code writing on occasion, it's not consistent. It's very impermanent and unreliable. And right now he's not making any money at all for work that he's doing right now.

Okay. I think that addresses all of the specific objections to the presentence report that I raised in the sentencing memorandum. I don't know what you want me to do beyond that right now.

THE COURT: Probably that's enough.

Let me hear from Mr. Hotchkiss and then we'll --

MR. ROBERT: It's my intention to make further argument about why a sentence of probation is appropriate for Mr. Channon.

THE COURT: I understand.

MR. ROBERT: Okay.

THE COURT: Mr. Hotchkiss, if you have any comment on objections you may proceeded.

MR. HOTCHKISS: Thank you, Your Honor.

I will join Mr. Robert's remarks regarding forfeiture, restitution, and loss with the following additions.

And just for the record, Your Honor, my objections are in Document 325 at pages 10 through 13.

And they were three in nature. One, to the loss; two, to sophisticated means; and, three, to minor role.

The addendum to the presentence report indicated that the government agreed that the sophisticated means enhancement should not apply to Ms. Channon.

And is that still the case?

MS. MESSEC: That's true.

MR. HOTCHKISS: Thank you. Then I will make no argument on that. Thank you, Ms. Messec.

So I will address first, Your Honor, just a couple of remarks regarding loss.

And on page 126 of the transcript from the last hearing on September 28, right at the end of my very brief cross-examination of Mr. Gardner, I had asked him, the Court may remember, if any of the cartridges that the Channons had submitted for recycling had been -- had come back to be resold by OfficeMax.

And his answer was that he guesses that's always possible. We don't know.

And I just wish to raise that, because since we don't know, there's this tendency to say no. But we don't know, and it is possible. Mathematical odds, whatever they may be, are certainly met from time to time in whatever endeavor one is engaged in.

Also, Your Honor, on the loss issue, the other comments I wish to make are that Mr. Gardner's testimony was based on an assessment that the sale of -- or the transfer of cartridges from OfficeMax to Clover was a separate transaction that -- when they came back.

And his testimony, as the United States has cited it in Document 368 was, you know, lots of references to different transactions, separate

transactions.

So Mr. Gardner's testimony is based on a transaction basis.

In preparing for this hearing today and reviewing everything, what struck me about this is there's no reference by Mr. Gardner to any contracts, any business documents, that govern any relationship between OfficeMax and Clover.

As a matter of fact, we have nothing from Clover that has been proffered, that I'm aware of, in terms of defining its relationship with OfficeMax.

And I also went back and looked because Mr. Gardner, on September 28, didn't identify his title.

And I went back to the trial transcript of July -- of January 14, page 309. And he identified his position at that time as manager of corporate investigations. So I'm not sure at all what he would know of OfficeMax's relationship with Clover, especially pertaining to the relationship between governing the recycling of ink cartridges.

So there are -- other than the numbers that we received in response to the Rule 17 subpoena, I'm not -- I don't recall any testimony about the nature of the relationship, the contracts, anything of that

nature, and that isn't in the record.

And finally, pertaining to loss, Your Honor. Again citing back to Document 325 at page 10, my written objections, in the middle of the first paragraph there -- actually towards the bottom of the first paragraph -- I wrote:

"Of the alleged 450,000, 270,000 is speculative and was not intended."

And that relates to paragraph 33 of the presentence reports, where the intended loss was discussed.

And I just wish to bring to the Court's attention because I again, in reviewing everything last night for this, I wish to bring up this possibility, if we need another possibility pertaining to loss, to throw into the hopper.

And that is that the intended loss could be the $180,000, comprising the actual loss -- that includes the actual loss of 105,191.

The way that the -- the accounts are then shut down, and the presentence report writes:

"Had -- had the Channons continued, they would have garnered an additional 270,000."

I had written in Document 325 that that $270,000, I proffered, was too speculative at that

point in time.

So I would just say that I think that it's very possible that the total initial intended loss before the deduction of any credits would be the $180,000 figure, which would at least initially reduce the loss by two offense levels.

Now I wish, Your Honor, to address the remaining objection on behalf of Ms. Channon, which is the minor role objection.

And I believe that the Court is very aware of and has a good memory of testimony in the case. But I just wish to refresh, if necessary, with some specific references.

And again this is to Mr. Gardner's testimony from January 19, beginning on page 997 of the transcript.

And Your Honor may remember most of my cross-examination of Mr. Gardner was designed for this moment.  I asked him a series of questions pertaining to trying to siphon out -- to determine Mr. Channon's involvement and Ms. Channon's involvement.  So on page 998, for instance, I asked:

"You didn't provide any testimony or any evidence through your testimony that Ms. Channon did any later online adjustments, correct?"

His answer:
"That is correct."
I asked Mr. Channon -- excuse me. I asked Mr. Gardner that he -- this is the top of page 1,001.
"Now you didn't testify, and I don't think through your testimony there was any evidence presented connecting Ms. Channon to the use of the MasterCard debit or credit card ending in number 4445, correct?"
And his answer was:
"Yeah. I don't remember any find- -- ever finding any evidence that would link her directly to using that card."
Down below on that page I asked if there were --
"And I believe you admitted in your direct testimony earlier today, near the end of your testimony, that no accounts at issue in this case were in the names of Brandi Lucero or Brandi Channon, correct?"
Answer:
"You're correct. I was unable to find any."
I asked:
"And you have no evidence of any MaxPerks

rewards being assessed to any account controlled or belonging to Ms. Channon, correct?"

Answer:

"Correct."

And that is over at the top of page 1,002.

And then on 1,002:

"And you have no evidence that Ms. Channon ever used a computer in this alleged conspiracy, correct?"

Answer:

"Yeah.  I have no idea whether she used a computer or not."

Then also pertaining to Agent Brody's testimony, Your Honor -- and I'll be referring to pages 1,010 through -- 1,010, 1,011, 1,013 -- excuse me.  Yeah.  1,110, 1,111.

And you may remember I asked Agent Brody about the search warrant affidavit and went through how long the affidavit was.  And I asked him if he remembers it had 101 paragraphs.  He answered "Yes." This is page 1,110.

And I asked:

"And do you also remember that Ms. Channon was mentioned in only three paragraphs?"

Answer:

"Yes, that's correct, sir."

And the next question I asked:

"And do you remember that you identified, quote, the perpetrator of the fraud scheme was Matthew Channon?"

Answer:

"Correct. That's correct, sir."

And I asked him:

"Do you remember saying that the over 4,500 MaxPerks accounts believed to have been created by Channon, meaning Matt Channon?"

Answer:

"That's correct, sir."

Over on page 1,111 my question to Agent Brody:

"And it covered -- and it covered from the PayPal records in eBay to creation of accounts and your -- your under-oath statement was you believed Matt Channon was the one behind that."

Answer:

"That's correct, sir."

And, Your Honor, we had Ms. Channon's -- evidence of Ms. Channon's statement that she provided at the time that the search warrant was executed at her residence. And the Court may remember that

Ms. Channon had indicated in that statement that -- to the FBI, as testified to at trial, that she indicated that whatever the FBI was there for that day, that she wants to be blamed for it and it was her who did it.

She loves her husband very much. She was just at that point in time recently married.

And the rest of her statement -- and again, I'm arguing pertaining to minor role, Your Honor -- is infused with her recognition of being involved, according to this statement. But she admits to doing things in this statement that didn't happen.

The evidence presented at trial, for instance pertaining to the purchase of the ink, did not include any testimony about Brandi Channon. Yet she wants to include herself, according to the FBI version of her statement, in that. And she says "they."

But the evidence presented has no involvement by her.

She also admitted in that statement that in creating the accounts they would create these accounts, quote, by hand.

And the evidence at trial was, of course, that they were created not by hand, but by some kind

of a computer program or whatever the word would be, script or whatever, and that none of them were created by hand.

So her statement -- also the reality is is that of a minor role. The inaccuracies, the willingness to want to join her husband, who she loves very much, created some inaccuracies in her statement when one looks at the evidence.

So she -- Ms. Channon did not have any central role. She had no independent control. Nothing she did was indispensable.

There were -- in my recollection, there were some days at trial, Your Honor, where her name was even barely mentioned, and Mr. Channon's is mentioned some hundreds of times.

She did not play a critical role. She was not in charge of any aspect. There was no evidence that she initiated, created, directed, operated, administered anything in this case.

And as a result of being married to Mr. Channon, she was a -- of any possible benefit, she was a passive recipient of those benefits.

So Your Honor, for all of those reasons -- and I guess one final thing, Your Honor, in terms of this.

Just to go back to the last hearing, you may recall that I had begun a brief cross-examination of Agent Moon on a few exhibits that had been admitted at that hearing, and Ms. Messec had stood up and stipulated that none of those exhibits pertained to -- had anything to do with Ms. Channon.

And while Ms. Channon was convicted of the three counts that she was charged with, and two of those three counts pertained to two days of taking 20 ink cartridges into an OfficeMax store, possibly totaling 40 ink cartridges, when we're talking about 29,000 ink cartridges, I suggest that the evidence is very strong here that Ms. Channon had at least a minor role, if not a minimal role, in this matter.

And we would request that you so find and accordingly deduct and reduce her offense level.

Thank you.

THE COURT: All right. Thank you, Mr. Hotchkiss.

Ms. Messec, do you have any further comment?

Was there something else?

MR. ROBERT: For Matt Channon we will adopt and join in the argument with respect to loss that Mr. Hotchkiss made on behalf of Brandi Channon.

THE COURT: All right. Thank you.

You may proceed.

MS. MESSEC: I have a few brief remarks in response to both of those arguments.

The first, as to Mr. Robert's argument again regarding this idea that OfficeMax made a huge profit off of the ink cartridge recycling program.

The Court knows from the government's submissions that the government believes that this entire idea of profit of the ink cartridges is completely bogus. It doesn't matter if any of those cartridges came back and were eventually sold by OfficeMax in the stores, because those cartridges don't cause OfficeMax's profit in any way that the legal system recognizes.

If -- if OfficeMax were making a huge profit off of this ink recycling program, then I would ask this: Why do you have to trick them? Why do you have to sign up for 5,000 accounts under fictitious names? Why can't you just show up at OfficeMax with a truckload of ink cartridges and say, "Here I am, and you should welcome me with open arms," if they're really making such a tidy profit off of this program.

But you can -- you can even accept, just

for -- for purposes of argument -- that there was a profit on the ink program, but that doesn't change the loss calculation.  It doesn't change the defendants' culpability in this case because it completely ignores the main part of their scheme, which was online adjustments.

So the online adjustments are in no way able to be offset by some type of credit to OfficeMax.  There's no way they can argue that OfficeMax profited from them.

And I think it's very purposeful that we have heard almost nothing in the sentencing phase about online adjustments, because they were straight-up theft and greed.

Which -- this takes me, then, to Mr. Hotchkiss' point about the intended loss, which he does seem to acknowledge that the Court, in looking at this whole case, needs to take an intended loss from the whole scheme, not just the part of it the defendants think they can explain away.

So he said the intended loss could be understood to be the $180,000 that's mentioned in one of the paragraphs of the PSR.

And I agree that that is, at a minimum, a component of the intended loss.  But that $180,000, I

just want to be clear, is what the Channons almost got through the -- through the online adjustment scheme before it was shut down.

But that doesn't take into account any of the actual rewards that were redeemed on the Group 1 accounts.

So when you add the two components together you get to $248,523.

And there's really -- I don't see how there can be a dispute that this was an intended loss in this case, because it was very nearly a completed loss. If OfficeMax hadn't shut down some of those rewards they would have been spent. It was this close.

So you're at 248,523. The next loss threshold is $250,000. So how do you get above that loss threshold?

Well, you can consider the Channons had just created a thousand new accounts that they had had no chance to use before their scheme was shut down. They were in the midst of creating more accounts when the online adjustments were shut down. They had just returned from a trip to the east coast to visit OfficeMax stores. They hadn't used any of the receipts from that trip yet to make online

adjustments.

But prior trips to California and to Texas led to 9,000 online adjustments and 14,000 online adjustments, and those were still going on September 17 when OfficeMax shut this scheme down.

And we know that even after online adjustments were shut down, the remaining portion of the scheme which was still possible, being the ink recycling and the small number of online adjustments they were able to make manually in the stores, did go on until early June 2011.

So their fraudulent intent endured at least that long. There's no reason to think they would have tempered their own behavior during that time frame if OfficeMax hadn't done what it did.

But the Court only needs to find an additional approximately $1,500 in intended loss before -- above the next threshold for a plus-12 loss.

Mr. Hotchkiss also addressed the minor role argument for Brandi Channon. I think there's no question in this case that she played a lesser role than her husband. That supports the appropriate aggravating role enhancement for him. Even though I think it's -- it's entirely appropriate for the Court

to take her different role into consideration in arriving at her ultimate sentence, she doesn't qualify for a minor role under the standards set forth in the guidelines.

I have argument regarding the 3553(a) factors if the Court would like to hear that at this time.

THE COURT: Well, it sounds like we're going to circle back to that anyway.

All right. Anything else?

All right. I have considered your objections: the loss, the intended loss issue, the forfeiture issue, and the restitution issues. And I have to -- I have to say that I have -- let me -- let me start with the forfeiture issue, because that ties in with the restitution issue.

And I've tried -- I've tried hard to see this the Channons' way. I think that there is some maybe initial -- oh, what's the word I'm looking for? The argument, at least initially, is somewhat attractive that, "Gosh, the Channons provided these cartridges to OfficeMax, and what they got back in return was not only the essentially $3, but by providing this product to OfficeMax, clearly OfficeMax made a lot of money on resale."

I -- despite the fact that that seems somewhat attractive, at least on the surface, once you actually think about it, it's hard for me to agree with you. And ultimately, I -- I can't agree with you on the forfeiture issue.

What I'm saying is, I don't think that you're entitled to the credit that you have argued for here.

The -- the -- so I heard Mr. Hotchkiss talk about there's no contract between OfficeMax and Clover. But by the same token, there's certainly no agreement between the Channons and OfficeMax that together they have this joint venture that they would bring in inkjet cartridges and they would -- they would somehow have a stake in the ultimate sale of inkjet cartridges by OfficeMax.

The problem for me is that the Channons, along with whoever else in the world who brought empty inkjet cartridges to OfficeMax, the transaction between the Channons and OfficeMax was nothing more than we're selling you our used inkjet cartridges. That's the end of the story. They got the $3 benefit, the $3 gift card rewards benefit, and that was the end of it. Nothing more was expected of them by OfficeMax, and that was really the end of the

story.

So then OfficeMax takes these inkjet cartridges and sells whichever ones are usable to Clover, but that has nothing to do with the Channons.

Clover then remanufactures them and OfficeMax purchases however many they purchase from Clover, and then they sell them.

None of what occurred between the time the Channons sold these inkjet -- used inkjet cartridges to OfficeMax to -- nothing else that they did benefited OfficeMax.

So -- so somebody else took these cartridges and did whatever they needed to do to make them usable. I heard some testimony that -- that it's not just a matter of filling them up with ink and putting them out on the shelf. What I heard was that it was more complicated than that.

There could be pieces from cartridges that are used or salvaged or usable or not usable.

The point being that there is a lot of work that goes from receiving these empty cartridges to putting them back on the shelf.

And I didn't hear any evidence that it was a seamless transaction. In other words, that the Channons had no reason to expect that the inkjet

cartridges that they sold to OfficeMax would ever be sold again by OfficeMax.

There's just no way for me to say that the Channons would have had any reasonable expectation that the product that they were selling would be then sold again by OfficeMax.

One of you mentioned a Walmart example, that Walmart buys products, and if that were the end of the story, then Walmart would never have any profit because all they did was lose money by buying products that they sold.

The difference -- well, one of the differences is that whatever product they buy, it's presumably ready to be sold. There's no additional work, no additional effort, no additional transactions from when Walmart gets it in the door and Walmart sells it.

I didn't really find that example to be all that helpful.

There was an example of the wheat farmer who sells wheat to a mill and -- and then at some point, steps later, that becomes bread, and the farmer would not be entitled to any proceeds from the bakery's sale of bread.

That's a helpful example. It certainly

bears out the reality of what we were dealing with here.

But I also wondered if -- if we took just our case here. If Mr. Channon were buying empty inkjet cartridges -- and just because I'm not a mathematician, let's say he bought a thousand inkjet cartridges for 50 cents, and let's say that he receives his supply. He paid the $500 and he sees that he didn't get a thousand, he only got 500. He takes his 500 to OfficeMax and gets $3 back for each of those, so he has $1,500.

Does he then go to his supplier and say, "You owe me -- you owe me 500 cartridges. I paid you for a thousand and I only got 500."

Would his supplier then say, "Well, you -- you made money on the sale of your cartridges, so I should get a credit. I don't have to give you more money because, after all, you made much more when you sold the 500 that I gave you to OfficeMax."

I mean, I would suggest they are unrelated transactions.

If Mr. Channon was shorted by 500, even though he paid for 500, I would assume he would want his $250 back. And I would assume that it wouldn't be reasonable for him to say to his supplier, "I made

money, so you don't need to give me any more money."

I don't know. My example is not perfect, but -- but I think it makes the point.

So my point is that I don't think the Channons are entitled to any credit for what occurred with the empty cartridge -- inkjet cartridges when they were sold back to OfficeMax. They sold them, they got their $3 rewards. That's all that they were expecting.

And even if we could prove that the Channons' inkjet cartridges resulted in X number of dollars profit, which you know there's no way to -- to show that.

But even if we could show that there was a straight line from the Channons' empty inkjets to some amount of profit, I'm not sure -- I'm not satisfied that the Channons are entitled to that credit anyway, because their transaction was a discrete transaction. They had nothing that suggested that they were entitled to anything more than they received, which was the $3 credit.

So I don't see -- so I'm inclined to grant the -- I will grant the government's motion for forfeiture.

I think that the money judgment is

appropriate. The rule and the -- the case law in our circuit allow for the payment of money where there is money that is traceable to loss.

And based on the evidence that I heard at trial, as well as the additional evidence that was presented at the hearing we began at the end of September, I just don't think that there's any question that the government met its burden that -- that a financial loss is clearly traceable to the actions that the Channons took.

The statute -- let me see if I can find my notes here.

The -- well, I think I've addressed the forfeiture issues. I think the evidence clearly shows that the losses are traceable to the actions of the Channons, and a monetary judgment is available under forfeiture both by rule and by circuit decisions.

So -- so I will grant a money judgment in the amount of $105,191.

Now, the intended loss issue. So the guidelines -- of course we have offense levels that are tied to loss and intended loss -- actual loss, intended loss.

And here -- so what we have here is not

just a situation of how much money did OfficeMax actually lose as a result of the Channons' actions?

The way the guidelines are structured is that we also look at how much did the Channons intend for what -- what the loss is that the Channons intended?

And of course in this case, the government argues that the intended loss amount is in excess of $250,000, which then triggers a different offense level under the guidelines.

And of course the Channons argue that the intended loss is much less than the $250,000 mark so that a lower guideline would apply.

Again, I have really tried hard to agree with the Channons, but I -- but I don't see that that's where the evidence takes us.

The amount of loss -- to back up a moment, when this -- when this scheme was shut down by OfficeMax, there's no doubt that this scheme was on the uptick.

There was an exhibit that the government attached to -- I believe it was the response to the defendants' objections -- and it has a graph that showed that some of this activity was on the rise when the Channons were stopped.

So what might have happened, had they not been stopped, is something that either the defense contends is speculative, but we are allowed to make certain conclusions based on what we see in the evidence.

And I certainly see that the way the Channons conducted themselves, the fact that they had just made a trip out of state to various OfficeMax stores, clearly suggests that they had no intention of stopping. In fact, they apparently had instructed others on how to do more of the same.

So -- so believe me, I would be -- I would not be honest with you if I told you that I wasn't looking very, very closely at whether or not the facts that we saw in this trial justified arriving at an intended loss figure that is under $250,000.

But I just had to conclude that the evidence supports an intended loss that is in excess of $250,000.

I mean the presentence report suggests that it's much more than $250,000. And while I don't intend to make any finding above the 250 -- beyond what I just said, that there was at least $250,000 in intended loss, I recognize the fact that the presentence report did a calculation based on the

monetary amount that was real. I mean, it didn't just pull it out of thin air.

It took the mathematical -- it took the numbers and did a mathematical calculation that explained to us where it came from.

And while there is certainly logic to it, I don't think I need to find that. We -- we've -- the calculation was that the first six months of this scheme on average, which is on average, was about 30,000 per month.

So had it performed at that level for the nine months of -- nine remaining months, it gets us well above the $250,000 mark.

So -- so I overrule the objection that the -- that the 12-level increase is not appropriate. I do find that it is appropriate, and so I overrule the objection.

Now Mr. Hotchkiss also argued, on behalf of Brandi Channon, that she would be entitled to a minor role adjustment.

And again, I do agree that Mrs. Channon's involvement was to a lesser degree than Mr. Channon's conduct.

But when I look at the guideline, the list of factors as to when minor role is appropriate, I

don't see that Mrs. Channon is entitled to a minor role.

There's no question that she was part of this and she understood the scope and the structure of the activity. She may not have been the one to design any computer programs, but she certainly participated in -- in planning this.

I mean we saw video of her walking in separately, I might add from Mr. Channon, into the OfficeMax stores to sell the cartridges.

I know that she admitted to -- and even if I exclude things that she tried to take the blame for that clearly she wasn't to blame for, even if excluding that, she was a -- a very active and involved participant in -- in this scheme.

She was -- well, I don't need to rehash all of the evidence. The point is that she was sufficiently involved that I do not -- I don't think she was as responsible as Mr. Channon. Don't misunderstand me on that score.

But she -- she stood to benefit. She was involved over the course of months in participating in this scheme, and she participated in opening accounts.

And I saw, based on the evidence, that she

clearly understood what was going on. She was involved with it and she benefited from it.

So I -- I don't think that -- so I'm going to overrule the objection regarding minor role for Ms. Channon.

Now, I recognize that 3553 is different. I'm talking about the guideline offense levels here. I'm not talking about what a final sentence would be.

I'm simply saying that I think the guideline calculation is correct with respect to both Mr. Channon and Mrs. Channon, and so those objections are overruled.

Now, there was also -- did I omit any objections that I need to take up at this point? I think I -- I think I addressed them.

MS. MESSEC: I think that Mr. Channon also objected to paragraphs 26 through 31 of the PSR, the ones that concern the Channons' involvement in schemes at Office Depot and Staples, saying that they are uncharged and unadjudicated.

The government contends that we put forth sufficient information that there were schemes at those stores to include that information in the PSR, for the Court to consider it.

THE COURT: All right. Well, I put this

pretty much in the same category as the disputes that Mr. Channon had with his prior business partner. I -- I look at these as issues that are not necessarily proven. So I -- I see that they're there, and I don't necessarily rely on those paragraphs for purposes of arriving at a sentence.

So I think the proper -- they're properly in the presence report. I -- you know, they're -- so I am not going to sustain the objection. I will overrule the objection.

But I don't know how much I would actually rely on those in arriving at any appropriate sentence. So...

So essentially, I agree that they should be in the presentence report, but I'm not necessarily going to be swayed one way or the other by them.

Anything else in terms of objections?

MR. ROBERT: Aside from the Office Depot and the Office -- and Staples, there were the -- what was the category? -- behavior not a part of the offense conduct related to these other things that we were talking about earlier.

I'm not really clear on -- yeah, offense behav- -- offense behavior not part of relevant conduct. It's not offense behavior. It has nothing

to do with the case, and I don't know if I fully understand what the Court's saying.

If they're not -- if you're not going to consider it, that's fine, then I don't need to speak further.

If you are considering it, then I guess I've made my objection and I continue to make it.

This is a separate category of conduct. The Office Depot and the Staples, at least, is contextually relevant to what was charged and deserves finding. But the other stuff is just character assassination, and I object to its inclusion.

THE COURT: And I understand your position. You know in -- in -- once we get -- I told you I'm not swayed by it one way or the other, and that's the fact. I'm not considering that conduct in arriving at a sentence.

But -- but I will point out that once we get to -- get beyond just the guideline calculation, there are a lot of things that -- that we look at that are not necessarily convictions or even similar conduct.

So that's one of the reasons why I'm not directing it to be removed from the presentence

report. It's there, and I -- it's there for what it's worth, which is unproven, and what I heard was disputed conduct.

And so I think -- I think all of the objections have been addressed.

So I'm ready, then, to hear what you have to say about sentencing.

(Discussion off the record.)

THE COURT: If the court reporter needs a break we take a break. So how about 10 minutes?

(A recess was taken from 11:03 a.m. to 11:15 a.m.)

THE COURT: Please be seated.

At this point I'm ready to take up argument on the sentencing issues, and so I think at this point it makes sense to go separately, since your arguments are not going to apply to both defendants.

And I think it makes sense to start with Mrs. Channon. So whoever -- Mr. Hotchkiss, you may make any argument you'd like to make with respect to sentencing.

MR. HOTCHKISS: Thank you, Your Honor.

May it please the Court and Ms. Messec.

Your Honor, at this phase of the proceedings, I believe that Ms. Channon is in

Criminal History Category I, offense level of --

THE COURT: Wait. Give me one second. Hold on. I just have so much paper up here I want to make sure I have what I need.

All right. Please proceed.

MR. HOTCHKISS: Thank you.

Offense level of 19 and a sentencing range under the guidelines of 30 to 37 months.

As stated in my -- the sentencing memorandum, Document 325, we are requesting a noncustodial sentence, a sentence of probation for Ms. Channon.

This Court -- she is eligible under statute. And understand that the Court, if the Court does grant her probation, the term is for one to five years.

First of all, just to take some of the fresher information, we would request, Your Honor, that you do consider under 3553(a) the lesser role that Ms. Channon served under the evidence presented at trial and under her convictions in this case.

I don't think I need to restate what I stated earlier. If the Court -- I will just avow my remarks that I've made in arguing for minor role to right now. So I just wanted to state that, because

that was fresh information.

And I believe that in conjunction with that, that her statement that she provided at the time of the search warrant being executed should also be considered. That did emerge as a vital piece of evidence against her. She -- the testimony at trial was she provided that statement, and that statement did serve to be a vital piece of evidence against her.

And I think it's also very enlightening about Ms. Channon. And she had a long-term relationship with Matt, and she was married just shortly before that search warrant was executed, and she has loved her husband very much for many years. And as the statement that -- I don't think I will forget any time soon -- that she apparently provided to the FBI agent, and she loves him so much that she wanted to absorb all responsibility.

I'm not -- I don't believe I've ever seen that in a case before.

And I found it very interesting, because I've thought, prior to receiving the letters from her family members in this case, that sense of loyalty was very unusual to me and hard to understand without being -- not being critical, but just trying to

understand.

When I got the letters that I think are some of the best letters I've ever received, because they're not only great letters, but I think they were very revealing of parts of a person that we wouldn't have known. And it actually enlightened me as to her general senses of loyalty, including her loyalty to her husband.

Ms. Channon is a glue in her family, according to these letters. These letters talk about how wonderful she is, what a resource she is to her family.

Your Honor may remember the letter about her assisting a family that had a son with a bone marrow transplant in Denver, and she took care of, I guess the younger brother of that young man, and the family being deeply grateful, even writing they don't know how they could have gotten through that without what she did.

The other aspect of the letters that struck me was the story about the quilt made out of pajamas. And does the Court remember that from the letters?

The letters, I thought, were very enlightening, even to me as her lawyer, about aspects of her character, how much she is a valued member of

her family.

And what didn't surprise me was what a good mother she is to her little boy.

And I haven't been around Quinton much. I saw him the day of the presentence report interview at the Channons' residence, played a little ball with him in the living room. He's a nice little boy.

And it was very apparent, as is the case with any mother who has a very good relationship with her child, that that is, in fact, the case here. And the letters certainly objectively confirmed that.

And the pain in the letters that I interpreted from family members about the possibility that Brandi would be taken away from little Quinton is a very big concern, and is one of the major reasons we are requesting a noncustodial sentence, but not the only reason.

Ms. Channon has no prior criminal history. As one of the letters also revealed, no one in her family has been in this kind of a situation before.

She would have a very supportive family and lots of people to assist her in successfully completing a term of probation.

A significant event in this case, and one that has caused Ms. Channon a great degree of

anxiety, was the execution of the search warrant at her residence. It itself serves as an indication of how far away she is from criminal milieu.

The agents acted, under their testimony, as they typically do. And Ms. Channon, not being familiar at all and having the background that she did, this has caused her to have great anxiety, and I think that's reflected in the medical records that were supplied to the Court.

She still -- I asked her to document the medications that she is presently taking, and she's taking seven anxiety-related medications, and she still has nightmares and panic attacks traceable to that event.

And -- and I offer that as evidence of the fact that she is not likely to be involved in any further criminal activity. Her -- this one event has so traumatized her, this execution of the warrant, that that is, in a legal sense, a great deterrence to her.

She also has physical ailments. She has lupus and fibromyalgia. And three of the medications that she is taking are anxiety-related to lupus and fibromyalgia.

And she, I think indicated in the

presentence report, that the pain is such that it does impact her ability to have -- to do certain things with her little boy, and the anxiety associated with facing prison time has exacerbated that anxiety.

And again, in the legal sense, this all is indicative of a basis for deterring her from any possible further involvement in the criminal justice system.

Your Honor, we would request that as recommended in the -- by the presentence report writer -- that you grant some variances in this case.

That you grant a variance based on Ms. Channon's mental and emotional condition. This case has caused her great psychological mental trauma, as indicated by the medical reports, her statements to -- in the presentence report interview.

We would request a variance based on her mother and child relationship with her son, Quinton.

I am a stepfather to two now adult daughters. I, and any person who has a relationship with a mother and a child, knows that it is a very important aspect of the little boy's life. And I believe that her commitment to being a very good mother, as supported by the letters, also would

ensure compliance with conditions of probation, unlike somebody who doesn't have that commitment.

And relatedly, we would wish that you grant a variance based on her family ties and responsibilities which dovetail into her relationship as a mother.

The term of the probation, Your Honor, we have no position on.  I think she is an excellent candidate.  She's been on pretrial release, I believe on her own recognizance up to this point in time, and I think she's done very well, especially for a case that it's into its fourth year.

For all of those reasons, Your Honor, we would request that you sentence her to a term of -- to probation and to a term between one and five years.

Thank you very much.

THE COURT:  Okay.

MR. HOTCHKISS:  And Ms. Channon has decided not to address the Court.

THE COURT:  And so I'm going to -- just so that the record is complete, I'm going to ask Mrs. Channon -- I'm going to give her the opportunity to address the Court, so she can tell me whether or not she wants to address the Court.  All right?

So, Mrs. Channon, before sentence is imposed you do have the right to make any comment to the Court that you would like to. And if you have anything that you would like to say to the Court, I'm giving you that opportunity at this time.

Is there anything you would like to say?

DEFENDANT BRANDI CHANNON: No, thank you.

THE COURT: All right. Thank you, Ms. Channon.

Ms. Messec, any comment?

MS. MESSEC: Your Honor, I think I might save some time if I could just address both defendants' allocutions after.

THE COURT: Well, I'm going to pronounce sentence on Ms. Channon.

MS. MESSEC: Okay. I will save the bulk of my argument for Mr. Channon.

As we have already informed the Court, we don't believe that a sentence of probation is appropriate, given the magnitude of the offense.

But Mrs. Channon does have several mitigating factors that are not present in her husband's case, and it's appropriate for the Court to take those into consideration.

So I will refrain from making a specific

sentencing recommendation as to Mrs. Channon.

THE COURT: All right. Thank you.

At this time, let me ask Mrs. Channon and Mr. Hotchkiss to please come to the podium.

All right. I have -- I guess I have to say that this is an unusual case, in the sense that I guess I -- I guess I have not had a case where a scheme like this was -- was not only taking place, but for some period of time.

And quite honestly, Mrs. Channon, you and your husband are not the typical defendants that I see here in court.

I couldn't help but think to myself many times during the life of this case, during the course of the trial, during all of the other proceedings that we've had in this case, that if you and your husband used your talents and your abilities to earn a living in a more traditional way, none of this would have happened.

I understand that you-all pled not guilty, you went to trial, all of which is certainly your right.

And the jury didn't agree with your positions and you were both convicted.

I understand from what Mr. Robert said

earlier that you-all intend to appeal so that you're not in a position to make statements that accept responsibility.

I understand all of that. But regardless of whether you-all except responsibility or not, the jury concluded that you are guilty, so my obligation is to arrive at a sentence that is appropriate, given both the crimes that took place that you were convicted of, and also taking into consideration what the sentencing guidelines tell us the appropriate range is. And then in addition, consider you as an individual and your history and characteristics in arriving at what an appropriate sentence would be.

Part of what I have reviewed by way of this case -- I mean, I just have to point out that there has been argument made here that what was intended here -- and it wasn't necessarily on your behalf, primarily Mr. Channon's behalf, but it applies to you as well -- that in part, what was intended here was for everyone to make money and that nobody was harmed. No -- no individuals were harmed.

You know, I know that OfficeMax lost a certain amount of money, and it's true that no one lost their life savings, no one lost their retirement money. But be that as it may, I -- I understand the

argument that this was a scheme that was, to some extent, designed so that everybody made money. You-all made money, OfficeMax made money.

And while I understand the argument, I certainly don't agree with it because if -- if that -- if the intention was everybody makes money, I don't think that the way you-all conducted yourselves would have been necessary.

There wouldn't have been need for thousands of e-mail accounts. There wouldn't have been need for thousands of OfficeMax rewards accounts. There wouldn't have been the need to travel from state to state to go to hundreds of OfficeMax stores to -- to surreptitiously obtain information that you could then use to get these reward cards that you otherwise would not have been entitled to.

So -- so I know you-all haven't admitted guilt, and I get that. But I have to point out to you that if this were an above-board, we're-not-doing-anything-wrong situation, there would not have been the need to conduct yourselves the way that you did.

Clearly, what you did was against -- you committed fraud. And if this was a scheme that would have been acceptable to OfficeMax, then there would

have been no need to create so many fictitious accounts, thousands of fictitious accounts, and scour the country for OfficeMax stores to obtain transaction information that clearly wasn't yours.

So the long and short of it is: You were convicted, and so my job here is to arrive at a sentence that is sufficient but not greater than necessary to accomplish the goals of sentencing.

I have taken into consideration the very kind and loving comments your family members have made about you.

I have taken into consideration the fact that you have pretty significant health issues.

You have a young child who you care for and who, despite the fact that you have a pretty large family and friend support group here, the information I saw said that there really wasn't anyone else who could help with your child.

I read that Mr. Channon's mother and father are willing to care for him, but I also read that they're elderly and there are health issues.

So because of these facts, I have determined that a sentence below the guideline range is appropriate. The guideline range is 30 to 37 months.

And you have no criminal history. You have, again, health conditions. You have a young child who is in need of care, and so I have concluded that a probationary sentence is appropriate for you, and my intent is to sentence you to a term of probation for three years.

So that's what I intend to do.

Does anybody have any comment before I pronounce sentence?

MR. HOTCHKISS: Not on behalf of Ms. Channon, Your Honor. Thank you.

MS. MESSEC: No, Your Honor.

THE COURT: All right.

Mindy, can I see you for one second, please?

(Discussion off the record.)

THE COURT: So I told you I did intend to sentence you to probation. I neglected to mention the restitution. I do intend to order restitution.

By my calculation, I'm seeing that restitution is $96,278.

MS. MESSEC: The government is asking for $105,191. We had originally talked about that 90- --

THE COURT: 91?

MS. MESSEC: 96 --

THE COURT: $96,278.

MS. MESSEC: We originally had talked about that number to account for the 32-cent cartridges that the Channons turned in.

The government's position, that's not appropriate, it's not called for under the restitution statute. There's no place for the Court to do that.

We originally were willing to make that concession to avoid the entire dispute about the value of the cartridges.

Since they didn't do that, I just want to make clear that we don't believe that's appropriate. We're asking for the full amount of OfficeMax's losses.

THE COURT: All right. Thank you.

Well, I'm inclined to go with the $96,278 amount because while, yes, I recognize that you were willing to make that accommodation prior to the litigation, or the hearing that we had on the issue, it nevertheless appears, just to the Court, just to recognize the fact that there was at least some benefit that OfficeMax recognized in having received those cartridges.

So the Court will order restitution of

$96,278.

So with that, then, I will proceed to pronounce sentence.

The Court adopts the presentence report factual findings.

The Court has considered the sentencing guideline applications and the factors that are set forth in 18 United States Code, Section 3553(a)(1) through (7).

The offense level is 19, and the Criminal History Category is I.

The guideline imprisonment range is 30 to 34 months.

Pursuant to 18 United States Code, Section 3553(a)(1) through (7), the Court has determined that there exists the following sentencing factors that warrant a sentence outside of the applicable guideline range.

And that is the nature and the circumstances of the offense and the history and the characteristics of the defendant pursuant to 18 United States Code, Section 3553(a)(1), and the need to reflect the seriousness of the offense, to provide respect for the law, and to provide just punishment for the offense pursuant to 18 United States Code,

Section 3553(a)(2)(A).

So after evaluating the factors listed above, the Court finds that the defendant has no criminal history and the crime -- the crimes of conviction are nonviolent in nature. Nor does the defendant have a history of violence.

The defendant is 36 years old and is raising the child, her two-year-old son. She and her husband have a two-year-old son, and she is raising -- which they are raising.

The defendant suffers from anxiety, posttraumatic stress disorder, fibromyalgia, and lupus.

The defendant is anemic. She's allergic to a number of foods, and the defendant has multiple medical conditions which require various medications.

She also has a stomach condition which requires her to take medication before and after every meal and use the facilities regularly.

Based on these findings the Court has determined that a sentence below the advisory guideline imprisonment range will be reasonable and sufficient but not greater than necessary to accomplish the sentencing goals that are set forth in 18 United States Code, Section 3553(a).

The Court notes the defendant and the co-defendant fraudulently obtained $105,191 from OfficeMax.

So as to each of Counts 1, 2, and 4 of indictment 1:13-CR-00906-002-JCH, the Defendant Brandi Channon is committed to the custody of the Bureau of Prisons for a term of probation.  Said term shall be three years, and the term will run currently as to each count of conviction.

The defendant must comply with the standard conditions of supervision and the following mandatory conditions.

The defendant must cooperate in the collection of DNA, as directed by statute.

The following special conditions will also be imposed.

The defendant must complete 200 hours of community service during her supervision term, as approved by the probation officer.

And the Court is imposing this condition in order to require that the defendant provide service for her community.

The defendant must participate in an educational or vocational program approved by the probation officer.

And this condition is imposed to assist the defendant in obtaining employment.

The defendant has shown an interest in furthering her education, so this condition will also assist her in maintaining those education goals.

The defendant must not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

And this condition is imposed due to the defendant's status as a convicted felon.

The defendant must submit to a search of the defendant's person, property, or automobile under the defendant's control, to be conducted in a reasonable manner and at a reasonable time for the purpose of detecting illegal contraband and the monitoring of her computer.

And this is to be done at the direction of the probation officer.

The defendant must inform any residents that the premises may be subject to a search.

Now the Court is imposing this condition because the instant offenses involved the defendant using a computer to defraud OfficeMax.

The defendant is prohibited from incurring new credit charges, opening additional lines of

credit, or negotiating or consummating any financial contracts without the prior approval of the probation officer.

The defendant must provide the probation officer access to any requested financial information, personal income tax returns, authorization for the release of credit information, and any other business financial information in which the defendant has an interest or control.

The Court is imposing these conditions because the defendant will owe restitution. These conditions will ensure that any excess money that the defendant obtains is used to reduce her restitution obligations.

The defendant must participate in and successfully complete location monitoring for a period of six months, in the location monitoring program, with the radio-frequency technology under home detention component. The defendant may be required to pay a portion or all of such program costs.

And the Court is imposing this condition as a sanction because the defendant engaged in fraud for a period of almost two years.

The defendant must participate in and

successfully complete an outpatient substance abuse treatment program approved by the probation officer, which may include testing.

The defendant is prohibited from obstructing or attempting to obstruct or tamper in any fashion with the collection, efficiency, and accuracy of any substance abuse testing device or procedure.

The defendant may be required to pay a portion of the cost of treatment and/or drug testing as determined by the probation office.

The defendant must refrain from the use and possession of synthetic cannabinoids, commonly referred to as spice, or synthetic cathinones, commonly referred to as bath salts.

Now the reason the Court is imposing these conditions is because the defendant has a history of using marijuana.

So the defendant shall consent to the United States probation office conducting periodic unannounced examinations of the defendant's computers, hardware, and software, which may include retrieval and copying of all data from the defendant's computers.

This also includes the removal of such

equipment, if necessary, for the purpose of conducting a more thorough inspection.

The defendant shall not make any changes to the defendant's computer services, user identifications, or passwords without the prior approval of the probation officer.

The defendant must consent, at the direction of the United States probation officer, to having installed on the defendant's computer or computers any hardware or software systems to monitor the defendants computer use. Monitoring will occur on a random and/or regular basis, and the defendant must warn others of the existence of the monitoring software placed on the defendant's computer.

Now these conditions are imposed, again, due to the nature of the instant offense.

The defendant was involved in the creation of multiple accounts to further this fraudulent scheme.

Now, these conditions will assist the defendant in maintaining a law-abiding life.

Now pursuant to the mandatory Victim Restitution Act, it is further ordered that the defendant will make restitution to Office Depot in the amount of $96,278. Again, the Court is taking

into account the value of the ink cartridges that OfficeMax obtained.

Restitution shall be submitted to the clerk of the court, attention intake, at 333 Lomas Boulevard, Northwest, Suite 270, Albuquerque, New Mexico  87102.

The restitution will then be forwarded to the victim.

The restitution will be paid in full jointly and severally with co-defendant Matthew Channon.  However, if the defendants are unable to make immediate full restitution, then she shall pay no less than $50 per month or no less than 10 percent of her gross monthly household income, whichever is greater.

The Court has considered payment of a fine, but the Court does find that the defendant does not have significant financial resources, so the Court will not order a fine.

The defendant shall pay a special assessment of $100 as to each count of conviction, for a total of $300, which is due immediately.

The defendant is -- let me back up a second.  I'm sorry.

So pursuant to 18 United State's Code,

Section 3742(a), within 14 days of the entry of judgment, you have the right to appeal the final sentence of this Court, and you have the right to apply for leave to appeal in forma pauperis if you are unable to pay the cost of an appeal.

So let me ask counsel: Is there any reason that sentence should not be imposed as I've stated it?

MS. MESSEC: Your Honor, I did notice that there is one standard condition of probation, that the defendant should not associate with any person convicted of a felony unless granted permission to do so by the probation officer.

I think we might all save ourselves some trouble by making clear that this does not include the defendant's husband.

THE COURT: And so I will agree with that, that the defendant is not precluded from associating with her husband. But any other convicted felons, the defendant should not associate with anyone else.

MR. HOTCHKISS: And --

MS. MESSEC: I'd also like to have placed on the record whether the defendant has any objections to the other standard mandatory or special conditions of her probation.

MR. HOTCHKISS: No.
MS. MESSEC: And finally, if the Court has not already included the forfeiture determination joint and several to be part of Ms. Channon's sentence, I would like to see that on the record as part of the judgment.
THE COURT: And I will include that. I am going to ask for a final order for you-all to submit as well on the forfeiture issue, on the money judgment issue.
But the Court does -- the Court is requiring -- granting the government's request for forfeiture, a money judgment in the amount of $105,191, which is a joint and several obligation of both Mr. and Mrs. Channon.
MR. HOTCHKISS: We have no objection to the sentence as pronounced.
One slight factual correction is Ms. Channon is now 37 years old.
THE COURT: Okay.
All right. So I did say she was 36 years old. I will make note that she is 37.
MR. HOTCHKISS: Thank you, Your Honor.
THE COURT: With that, then, the Court imposes sentence as stated.

MR. HOTCHKISS: Thank you.

THE COURT: Next we will take up the sentencing of Matthew Channon.

Mr. Robert?

MR. ROBERT: Yes, Your Honor.

THE COURT: You may proceed.

MR. ROBERT: As Your Honor pointed out, this case is unique. I, over the years, have tried or handled various kinds of fraud cases. I tried a case 12 or 13 years ago involving $20 million in Medicaid fraud, when somebody billed Medicaid for services that were manifestly not provided. That was what I would characterize as mala in se, things that are clearly wrong, known to be wrong by the actor, known to be wrong at the time at which they're done.

Another case many years before that in which a former man of the year in -- is it Palm Springs, the one in California -- kited $5 million worth of checks between his car dealerships in El Paso and California. Again, something that was clearly known to be wrong. Mala in se, known by the actor to be wrong at the time at which they were committed.

We've seen cases that involved -- well, some years ago I represented, similarly, a group of

more than 60 people who had been defrauded by a so-called investment advisor, and that was somebody who had taken their life savings. You know, people who hoped to retire, who were robbed by this person. That is mala in se. It's known to be wrong at the time at which the actor committed the offenses.

This, although the Court has suggested a different view of it, is somewhat different because it was not seen that way by Mr. Channon.

An example of that, I think, goes to what the government talked about earlier in the online adjustment context.

One of the things that Mr. Channon had pointed out to me, and I think was addressed at some point during the trial, was a screen that was a part of the online adjustment, or some part of the website that made this possible, that said you can add a transaction -- not your transaction, but a transaction -- to your rewards account.

Now, I think -- I would never have thought to add somebody else's transaction. But to somebody who is used to examining the world at a microscopic and analytical level, that error by OfficeMax, by not specifying that it has to be your transaction, was an opportunity that Mr. Channon saw.

Now, would that make sense to most of us? Probably not, but that's now how he looked at it.

As I say in the sentencing memorandum, Mr. Channon is somebody who analyzes the world, looks at the world analytically, who is a -- by training a scientist, even though that's not what he's doing now. He's writing code now.

That, I think, goes to one of the essential differences between this and a lot of other fraud cases, in that this was not seen as, I'm going to take money out of your wallet. I'm going to steal money out of your retirement account. I'm going to embezzle from you.

This was not seen by him as that.

And as I've pointed out in the sentencing memorandum, the intent is highly relevant in terms of what the sentence ought to be.

And although we may not agree with the way that Mr. Channon analyzed what happened, it's certainly relevant to the Court's consideration about what kind of a penalty should be imposed here, in addition to the substantial financial penalties that are going to be imposed, given his view of this.

And again -- and I've said this before, and I don't want to dwell on it overlong, but he saw this

as a problem to be solved, as a system to be deconstructed, managed, and taken advantage of in a way that he thought was okay.

And again, although I understand that the Court takes a different view of this particular aspect of the argument, looking at the recycled cartridges for sale at OfficeMax and seeing the prices that were got for those things by OfficeMax, gave him good reason to think that they were making money on what he was doing with those cartridges.

And again the government says, "Well, the online adjustment has nothing to do with it."

That's not true. Because in order for you to gain that $3 you have to spend $3. And what was gained by the online adjustments was the appearance of having spent $3 for each of those cartridges, so they are related.

And Mr. Channon did see that as a moneymaker for OfficeMax, and it was. And I recognize the Court has already said, "I'm treating those sides of the transaction separately."

But in terms of assessing his intent, his moral and legal culpability, I think it's important that we give some recognition to what he perceived. And even though I might not have seen that whole

process the same way, I understand what he's saying. There's -- there's a loophole here. There's a word here. There's -- the way that they phrased this makes this okay.

That's what he thought. He didn't think he was stealing from anybody. And like I said in the memo, he was shocked when he -- he learned that he could be charged with a federal crime for what happened in this.

Let's talk about the aims of sentencing. And again, one of the things that makes this case unique was, as Your Honor has pointed out already, the complete absence of criminal history here.

And one of the things that I saw in some of the cases that I cited in the sentencing memo, that I guess I hadn't really thought about before, was there's Category Is and there's Category Is.

There are some Category Is who committed felony offenses 20 years ago. And now, because of the rules under the guidelines, those don't count for criminal history points or, you know, depending on the length of the sentence or the nature of the offense, even more recently than that, of criminal offenses that wouldn't count for criminal history points, and that person can still be a Category I.

As some of the Courts have pointed out, in the authority cited in the memo, this is a real Category I, and this is somebody that just isn't Category I, but somebody with a complete absence of criminal history.

And I think that's something that is actually a super Category I. If there's something below it, then Mr. Channon fits into that category. And I think that's something that the Court can also take into consideration.

So 3553 talks about the aims of federal sentencing. And to talk -- and to -- that a sentence should reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment. That is the first part of it.

Well, again, the seriousness of the offense, that concept occupies a spectrum that goes from completely innocent behavior to the worst manifestly evil behavior.

And again going back to the notion of practical intent in this case, I think the seriousness of the offense -- although we're talking about, you know, six figures here, you know, significant money -- the overall construct here, the whole framework has to be considered in determining

how -- what is the seriousness of the offense?

I don't mean to say that this isn't something that requires attention. And clearly the government and the Court has devoted enormous resources to the prosecution of this thing and they consider it -- consider it to be quite serious.

But again, going back and recognizing that this was not seen as theft or fraud by Mr. Channon when he did it, that that has to play into the determination of where, along that spectrum, this conduct sits.

Respect for the law. Well, again, the fact that Mr. Channon has no engagement with the criminal justice system up until now speaks to that in a significant way.

But here's another aspect of that.

This case has been going on for -- going on more than three years. It has occupied the attention and the time of both Mr. and Mrs. Channon for a long time. And again, like I said, they never -- he never expected that this could possibly result in criminal charges.

This experience has taught him an amount that can't really be quantified or maybe even described.

This experience has just, as of today, whether or not you impose a sentence of -- a custodial sentence, I guarantee you the lesson has been learned and the message has been conveyed.

Mr. Channon is not going to want to go through anything like this again. As he's not -- up to now, he's 39 years old. He'll be 40 next February, I think.

The -- the notion that a custodial sentence is required to impress -- to impose respect for the law, I think, is inapplicable in this case.

Just punishment, obviously, Your Honor, that's up to you. What is just punishment in this case?

And obviously, two of the factors that will be included in the Court's sentence are restitution and forfeiture. Essentially, a double whammy on the loss that the Court has concluded that the -- that OfficeMax sustained.

And by the way, I don't know if I've made it sufficiently clear, but that -- our objection to the calculation of the loss that we expressed and to the forfeiture, although somewhat a different matrix, we also object to the Court's calculation of the restitution amount, understanding that the Court has

already made that determination.

But I wanted to be clear that that's also a feature of the possible sentence that we want to make sure we're on the record as having objected to. Okay.

The second B, under 3553(a)(2), is deterrence.  And again -- well, the sentencing memorandum was full of statistics that the sentencing commission has compiled, and the statistics speak to a variety of factors, many of which apply to Mr. Channon.

The sentencing commission calculates the likelihood of recidivism on the basis of those factors independently, mostly, of one another.

Mr. Channon presents with all of the factors that I have identified in the presentence -- in the sentencing memorandum.

And if you're simply looking at this in a statistical way, Mr. Channon presents virtually no chance of recidivism.  And again, I will go back to what I said before.

This experience has been, well, once in a lifetime.  And he is, as we sit here today before sentence is imposed, well and truly deterred.  This is not going to happen again, simply because he

didn't think it could happen this time, but I will guarantee you he's going to be careful that it never happens again.

So I think that a custodial sentence is not necessary in order to accomplish the aim of deterrence. Okay?

What about protecting the public from further crimes, the C subsection of those subsections?

I think the same analysis applies. Do we need to protect the public from further, if you will, abuse of a rewards program or any other kind of fraud?

And I suggest to the Court that the same reasoning applies.

Mr. Channon didn't think that he was committing fraud this time. He has now been brought to the well of the Court to face sentencing for what he did.

Again, without trying to repeat too much, there's no need to protect additionally beyond where we are today, because it's not going to happen again.

The experience that we've been through has been sufficiently potent to make sure that all of those aims are achieved as we stand here today.

And the last, to provide the defendant with needed educational or vocational training, medical care of the correctional treatment in the most effective manner.

Well, I don't know that it can be said that Mr. Channon requires any training.

To the extent that he needs training to make sure that he doesn't do anything that's going to cross the line again, once again, I'd say we're pretty much there as we stand before you.

But Mr. Channon has exceeded, excelled in an academic setting. He's got the bachelor's, master's degree in engineering from Georgia Tech.

He has, even beyond the things that he learned in school, he's demonstrated the ability to make a living doing what he's doing now, which is writing computer code. So training isn't required.

Mr. Channon doesn't need to be trained not to break the law because, again, this experience has been as potent an educator as can be contemplated.

The only training that would occur would be of somebody else. If Mr. Channon goes to prison, I'm sure that he'll be called upon to provide training to other folks not as educationally gifted as he, but that's not necessarily what 3553(a)(2)(D) thinks

about. That's actually -- I think it's discussing what training and other education needs to be provided to the defendant. And that's -- I would submit nothing is really necessary here.

So a custodial sentence is not necessary to achieve the aims of sentencing as described by statute.

Another statute that I referred to in the sentencing memorandum, 944(j), talks about the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender, who has not been convicted of a crime of violence or an otherwise serious offense.

Congress has spoken. Congress has said, in the appropriate circumstance the Court should default to probation where a person like Mr. Channon has no prior criminal history.

That statute, I think, gets ignored when we talk about the sentencing guidelines, and even when we talk about 3553, but it's there.

And Congress has told us that in the appropriate case -- and I submit this is one -- that the Court should default to a sentence of -- a noncustodial sentence which accomplishes the aims of sentencing described in the other statute.

I've also cited cases in the sentencing memorandum that talk about the appropriateness of a substantially below guideline sentence in these kinds of cases in appropriate circumstances.

A number of white collar cases in which the Courts have imposed sentence -- I think there was even one in which the guideline range was 360 to life and the sentence of 60 months was imposed, other sentences involving significant variances or departures from the guidelines for these kinds of offenses.

One of the things that we've learned in the last 12 or so years, after Booker, is that the Supreme Court has told us that the Courts -- these Courts, District Courts, sentencing judges -- have an important role to play in guiding sentencing policy and instructing the sentencing commission about what's right.

That means that when a judge imposes a sentence, for example, of 60 months in a 360 to life situation, that the sentencing commission was told in that case, you're way off here. Your analysis of these things is wrong. In this case I disagree with you significantly.

And that's a role that District Courts play

in helping the sentencing commission to modify things as they go along.

The Courts have done so repeatedly in these kinds of cases, and I have cited a sampling of those cases in the sentencing memorandum.

Of course where conduct is aberrant, as the guidelines define that, there's even a departure that's appropriate for aberrant behavior.

But I submit that the Court can consider again, in the light of Mr. Channon's lack of any sort of criminal history in the past, that this transgression is aberrant, and that factor is worthy of the Court's consideration.

So the -- the factors that the Court described in talking about the sentence for Ms. Channon, the nature and circumstances of the offense -- and again, I've talked about that at some length. I've written about it in the sentencing memorandum, and I won't belabor the point here, except to say that this is not the typical case. It's not the typical fraud case.

And the nature and circumstances of the offense, I think, are worthy of deep consideration beyond what the guidelines have to say about how you calculate the offense level and the enhancements and

subtractions and those sorts of things.

I don't need to tell Your Honor this is -- this is kind of a unique situation.

Likewise, in considering the history and characteristics of the defendant, I've already spoken about that.

But Mr. Channon, he's 39 years old. He's well-educated. He's very talented. He's very smart, and -- and he will eventually come out of this, I think at the end of it, with an ability to make a living.

And again, I don't think you'll ever see him in court.

The fact that he's been on basically his own recognizance for three and a half years, if I'm not mistaken, without any problems, tells the Court that this is a person who will, given the conditions to comply with, will comply with them absolutely and won't give the Court any problem if the Court were to do what we ask and impose a noncustodial sentence, if there's ever a reason to believe that any condition that the Court imposes would be adhered to by Mr. Channon.

I talked about the need for deterrence and the real -- the lack of the real concern about that

here, both statistically and in practical manifestation, in that Mr. Channon's demonstrated an ability to comply with conditions and the lack of criminal propensity, other than his having found himself in this -- in this situation, having been convicted of a fraud offense.

The need to avoid unnecessary disparities has always been kind of an interesting notion to me, because every case is different.

And as I said in the memo, I think that the concept of avoiding unwarranted disparities also comprehends the need to avoid unjustified similarities.

If we're going to treat somebody in this situation just like we treat somebody in a different situation because the guidelines are this and the statute says that, then we're really not individually sentencing people. We're really not considering each individual offense and each individual defendant.

And so sort of ritualistic adherence to the guidelines and ignoring the individual features of a case, or the individual features of a defendant, I think contravenes the notion of avoiding unnecessary disparities among sentences.

Sorry. I'm -- we're out of water on our

table, and I find myself -- I suppose that's because I talk too much.

THE COURT: You said it, not me.

MR. ROBERT: Letters have also been submitted on behalf of Mr. Channon, and he's also very well thought of by people. He's a good neighbor, a good father, a good husband.

In short, he's a good man. And of course the government is going to disagree with my characterization of him in the sentencing memorandum as a model citizen because of -- you know, things that they see in a certain light in his past, and certainly this -- their perception of this conduct.

But again, I see this as an aberration.

And this is a person who is devoted to his wife and devoted to his son. And as the Court pointed out in talking about Ms. Channon, it's not just her that's raising Quinton. The two of them together are raising their son.

And his support, not just for him -- Mr. Channon's support not just for Quinton, but also for Ms. Channon, who as the Court recognized, has to deal with a variety of issues that challenge her daily.

His support for her is really important for

her. But also, because of the support that he gives her is important for their son. Because absent that support, then one has to wonder if she'll be able to continue what she does now as a parent.

And I'm not saying that in any way to diminish her love for her child or her ability as a parent. But you take away that important part of this equation of that triumvirate, and it challenges everybody, not just Mr. Channon.

The guideline sentencing range here is 46 months to 57 months. That is almost four years to almost five years in prison.

I suggested in the memorandum how counterproductive that would be.

Mr. Channon, unlike most people who come before you, certainly most people that we represent, has the ability to make a good effort at meeting the financial obligations that the Court's going to impose on him.

He has the ability to make a living. He has the ability to earn decent money, and he may be able to repay the restitution that the Court orders and pay the government its forfeiture money.

The more time -- the time -- any time that he spends in prison is going to diminish his ability

to do that.

The more time that he spends in prison the more difficult his ability to make a living becomes. I'm -- I don't have to tell the Court, I think, how difficult it can be for somebody with a felony conviction, and even more, somebody who's done prison time, to get past an employment application, to get past an interview.

Things are going to be much different for Mr. Channon now, after a judgment is imposed and he has been formally convicted of a felony offense.

If he does a bunch of time in prison, that's going to increase the difficulty by orders of magnitude, and it challenges the ability of OfficeMax to gain restitution and for the government to collect its forfeiture money.

I think that's an important consideration. Obviously you can -- that can be said about any case in which a loss is involved. But I think, again, this is a unique situation because of Mr. Channon's ability to make a living.

Your Honor, I've said all of this in writing. I think it's all really important. I don't think prison is the right answer, although the government will disagree, and they will want a

sentence of at least 46 months.

That's how we have become in federal court. The guidelines say this, so we must follow the guidelines.

As I've said, other Courts have disagreed, and I also disagree. Serving a prison sentence will do no good to anybody. It will not increase his respect for the law. It will not increase any opportunity for deterrence. It will not protect the public. It will do nothing but cost the government money and possibly cost OfficeMax.

I ask Your Honor to consider the imposition of a probationary sentence with whatever conditions the Court considers appropriate.

Thank you.

THE COURT: All right. Thank you, Mr. Robert.

I don't know whether Mr. Channon intends to address the Court, but I will --

MR. ROBERT: He does.

THE COURT: Okay. So, Mr. Channon, if there's anything you would like to say, please come to the podium and I will hear you.

Mr. Channon, you may proceed.

DEFENDANT MATTHEW CHANNON: Thank you,

Your Honor.

In 2009 I was in a very bad financial situation. I had just had my business fail. I had some substantial medical bills I couldn't pay. I had just been sued, and these conditions forced me into a state of bankruptcy.

On top of it all I was working in Roswell for a company where I was talking to investors and representing the technical information that I was being fed to them, and I discovered that that was being fraudulently presented to me, and I faced a decision of either going down with the ship or cutting all ties with that company, because I knew at that point there would be trouble ahead. So I chose to quit with no ability to borrow any money, no ability to find additional employment.

This was back during the crash of 2008/2009. There were no jobs available in Albuquerque. There were no jobs available anywhere for me in the United States after substantial searching.

So I found an opportunity. With my limited resources, I found a way for people to make a small amount of living by what was going on in office supply stores every day. People were turning in

office supply store ink cartridges, they were refilling them, and they were putting them back on the shelf for people to buy.

I saw that relationship.  I studied it, and I determined that there was the potential for a win-win, where I would make a living, although modest, and I could support my family.

I had no idea anything I was doing could be a felony.  I had no idea that it was possible to commit a felony by violating the terms and conditions of a private company.

I had no idea it was possible to commit a felony by adjusting a receipt made in the purchase I didn't make, when that is exactly what OfficeMax had written in front of me.

So now a large question everyone always asks me is, Why?  Why, with all of my background, with all of my skills, with all of my benefits, did this go on, and did this go on for as long as it did?

The simple matter is, I needed to support my family.  My wife needed my help.  She is very ill. She still is.

And as a result of all of that, you know, I have to consider the future.  I have to consider where things are headed for me.  I have to consider

what sort of -- I'd prefer not to go to prison just because it would take me away from providing for my son, providing for not only financial needs, but also his parenting needs, his growth needs.

I feel a great deal of sorrow for everything that has happened here. I wish it had never happened, any of it.

I wish that all of the things that happened to Brandi that exacerbated her already bad conditions had never happened. I help her with those, deal with those, every day. And it's a constant reminder and it will be for the rest of our lives.

I think that's all I have to say.

THE COURT: All right.

MR. ROBERT: Thank you, Your Honor.

THE COURT: Thank you, Mr. Channon.

Ms. Messec?

MS. MESSEC: Thank you, Your Honor.

Since the beginning of this case, continuing through right now, the defendants have tried to paint their conduct as no big deal. This may be a little too clever, but not criminal.

To hear them tell it, all they did was take advantage of a program offered by a big company to a public, and when the big company discovered it was

losing money, it came crying to the FBI.

The jury rejected that version of events, and I hope that this Court has too.

Despite the impression that a casual observer of the sentencing proceedings might have taken, the Channons weren't charged because they were too into recycling.

If they had just been recycling too many ink cartridges at OfficeMax, I seriously doubt that the FBI would have ever heard of this case. I doubt that we would be here now.

But, no. What they did, and what you won't find any mention of in Matthew Channon's 22-page sentencing memorandum or his allocution now, is deploying a computer program in an attempt to steal hundreds of thousands of dollars from OfficeMax.

The mechanics of it may have been sophisticated, but the intent was theft, pure and simple. And that is mala in se. It doesn't take a genius to realize that that's wrong.

And what they did was remarkably effective. In just a few short months the Channons had generated about $175,000 in rewards for themselves.

Who knows what kind of losses they might have caused to OfficeMax if they had kept going, if

OfficeMax had not caught that online adjustment scheme when they did. They could easily have reached a million dollars or more in a fairly short period of time.

And there is nothing unseemly about a company, a victim, seeking the protection of the law when it's threatened with fraud-induced losses of this magnitude.

And the defense attempting to dismiss this whole thing as the government acting as a collection agent for a multinational corporation just shows the defendant's continued contempt for this proceeding and lack of remorse for his actions.

In considering the nature and circumstance of the offense, I urge the Court to keep in mind that OfficeMax was not the only victim. The Channons had schemes going at Staples and Office Depot, too, and we don't know the full extent of those schemes.

Matthew Channon was not the only perpetrator of the scheme because he and his wife had trained their friends to do what they were doing as well. And he -- as he even acknowledged -- is the reason his wife was standing here today for her own sentencing hearing.

When you turn to the history and the

characteristics of the defendant, one particularly salient feature is that he's shown no remorse for what he did. To say that he's sorry that it happened is a completely different matter.

And I understand he's going to take an appeal, and I understand why he's not, in light of that, saying something more to the Court now. That's a strategic choice that he made.

The Court sees a lot of defendants, though, who are pursuing appeals who, nevertheless, offer an apology for the things that they've done.

It's different to do what he did and continues to insist, as he's done today, that what he did was okay, that he never intended to defraud anyone.

A jury found beyond a reasonable doubt that he did have an intent to defraud.

His conduct does not appear to have been an aberration for him.

Mr. Channon embezzled money from his employer, that was money that other people had contributed to the company.

He lied on his taxes.

He even lied to save himself a few dollars in PayPal fees, or he encouraged someone else to do

that.

I mean, why would you compromise your integrity to save 10 bucks in PayPal fees? It's not something that is deeply ingrained in your character.

He was sued successfully for civil fraud, and then he moved all of his assets out of reach of his creditor.

Now I'm not saying that that was illegal, I'm saying it wasn't right. He is currently pursuing a frivolous lawsuit against someone he knew was a potential witness in this case, and against the news media for reporting on this very criminal case.

All of these things go to show his character.

And what's his excuse for his actions? That he didn't, like a lot of defendants, suffer childhood traumas. He has family support. He's well educated.

The only excuse that I've heard so far is that he is so smart that he just couldn't resist.

And to the government, that looks like an aggravating factor, not a mitigating one.

Another factor is protecting the public from further crimes of the defendant. And the things that I just mentioned about his past misconduct are

also reasons to believe that the public requires protection from further crimes of his.

He still doesn't think that he did anything wrong. So if he's not bound by any internal constraint, then what is there besides the sentence that this Court imposes to protect others from becoming victims in the future?

Sure, Matthew Channon doesn't want to get in this situation again, and I don't believe that he will probably be caught for anything like this in the future.

But if you look at his history of misconduct, I don't think the Court has any basis to conclude that this was an aberration or that he is not likely to commit a similar type of offense in the future.

Respect for the law and just punishment. These are also factors that require a substantial sentence of incarceration.

To say here today that what I did is okay because it said you can enter a transaction instead of your transaction shows exactly why he needs to receive a sentence of imprisonment.

Affording adequate deterrence. This is one of the primary purposes of sentencing, and the

sentence the Court imposes must be sufficient to fulfill it.

The Tenth Circuit has recognized deterrence as a crucial factor in white collar sentencings. A large variance that he's seeking, especially a probationary sentence, cannot send the necessary message either to him or to the public at large about the consequences of a crime. We can't endorse the message, to quote the 11th Circuit, that would-be white collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty.

The next factor the Court is to consider is the sentencing guidelines. That range is set at 46 to 57 months for Mr. Channon.

The fraud guideline serves the critical role of ensuring that the justice system does not deliver more favorable treatment to white collar criminals than to those who come from a different socioeconomic background than the professionals in this room.

The Court mentioned to Mrs. Channon, when she was standing here, that they are not the typical defendant.

But the guidelines exist to ensure that

they receive proportional treatment for their crimes, even if they aren't the typical defendant.

And it is not true, as the defense has suggested, that most federal judges have deemed the fraud guideline to be too -- too harsh.

89 percent, in the most recent survey, thought that it was appropriate or too lenient. Most offenders in the bottom half of the loss table, where Mr. Channon is, receive a sentence very close to the recommended guideline range.

And that brings me to unwarranted disparities. First, there's a question of disparities between Mr. Channon and the sentence that his wife just received.

The Court has sentenced Mrs. Channon to probation and also expressed a belief the government endorses that Mr. Channon is more culpable than she is. So it cannot be the case that the same sentence is appropriate for him as what she received.

The vast majority of fraud offenders are sentenced to prison terms. 70 percent get a guideline sentence or a government-sponsored reduction.

The median variance or departure for fraud offenders is only 12 months. A sentence of probation

would put Matthew Channon way out of line with other offenders who are similarly situated.

For all of those reasons the government asks the Court to impose a sentence within the guideline range of 46 to 57 months.

THE COURT: All right. Thank you.

Let me ask Mr. Channon, Mr. Robert to come forward.

Well, I -- I may repeat some of what I said to Mrs. Channon to you as well, Mr. Channon. But this is, again, not my standard scenario. I don't -- I don't usually have defendants like you and your wife in court for sentencing on cases like -- like your case.

There are a lot of things about you that I would expect that I would never see you in federal court for sentencing.

And I -- and I told your wife, and I'll tell you as well. If you put your -- your brains and your background to work in a way that is appropriate and aboveboard, I can't imagine all the things that you could have accomplished.

But for someone like you to -- to get involved in a scheme like this -- you told me why it happened -- it is -- it is somewhat surprising.

And I know the -- the argument has been made that this was an opportunity, and you reviewed the program rules or whatever the screen was that you saw that referred to a transaction as opposed to your transaction, and -- and thought that there was an opportunity.

It's hard for me to imagine that you thought it was acceptable, because you went to a great deal of trouble to -- to avoid detection, to -- to spread these activities around to different stores in different states.

And so when I see the way you conducted yourself, it suggests to me that you knew that you were doing something wrong.

Even taking what you said earlier, that not -- that you might not have considered that violating a store's program rules would be a violation of federal law, I mean, you were obtaining something that you weren't entitled to obtain, even using other people's transactions without their knowledge, all suggest to me that you knew you were doing something that you should not be doing.

So again, I -- as I said to your wife, I understand that you have your appeal issues that you'd like to take up with the Tenth Circuit, so

you're not in a position to acknowledge guilt. That's certainly your right.

But looking at the evidence in this case, it's difficult to imagine, based on what I saw, that you didn't understand that you were doing something wrong.

And fraud is fraud. So -- so I understand -- I understand what you're saying, I just don't agree with your -- with your view of it.

So as I look at your case and I look at what an appropriate sentence would be in your case, I have to say that taking everything into consideration, I do think that a sentence of imprisonment is appropriate. I do.

I don't, however, think that a low end guideline sentence is appropriate in this case, so I would be inclined to grant a variance for a number of reasons.

For one, you -- you have no criminal history, no history of violence.

I recognized that the presentence report has identified some situations in the past where you have been accused of embezzlement, or there have been disputes that you've had with -- with others. It's hard for me to -- it's hard for me to -- to say that

your -- you were right or they were right or you were wrong or they were wrong. I simply am not in a position to litigate those particular situations.

So I don't -- I don't use them to formulate a punishment for you other than to say to you that it looks to me like you have tried to -- well, let me say it this way.

It looks to me like your motivation to make money, get money, is something that might have led you down this particular path, which is why -- another reason why I think that restitution is not only warranted, but I see that as a way not only to make OfficeMax whole for the fraud that you committed, but it looks to me like it would be painful for you, because you seem to have been motivated by ways to make money.

And so I'm hoping that the restitution award, along with the forfeiture award, will get your attention that this is certainly not conduct that you should repeat.

Now I know restitution has its purposes, and I know forfeiture has its purposes. But it's an obligation that I'm going to be requiring in your sentencing, that you repay OfficeMax and that you also provide forfeiture to the government for your

conduct in this case.

Now, I have not -- you know, I saw the -- the argument about the government being OfficeMax's collection agent. I heard Ms. Messec take exception to that.

The fact of the matter is, you defrauded OfficeMax and you defrauded them of $105,191 worth of money, merchandise, whatever the case may be.

So obviously, OfficeMax is entitled to be reimbursed for that and made whole, and so I will order that.

I have not seen any kind of a statement from OfficeMax about what position, if any, they take on the issue of incarceration. I'm going to assume that, based on Ms. Messec's argument, that they are in harmony, that they would agree that a low end guideline sentence is appropriate in this case.

Let me tell you that if I had seen anything that suggested that you had harmed people -- and I used the example in your wife's sentencing of someone's life savings or someone's retirement -- I wouldn't have any problem at all sentencing you to a low end guideline sentence.

In this case what we have is a situation where I'm not aware of any individuals who claim they

were deprived of any money or property because of your conduct.

I am aware of OfficeMax saying that because of your conduct and the way you manipulated their rules you ended up with over $100,000 of value that they would never have sent your way if they had known the true state of the situation.

So -- so money is one way that OfficeMax receives justice in this case.

Because your history is not one of committing crimes, not one of violence. I don't see any drug issues here either as, you know, a user or a seller.

I mean, a lot of times I -- if I see people who are committing some sort of crime, oftentimes it's because they're trying to fund a drug habit or somehow are involved in other illegal situations, and I don't see that in your case.

So I am looking at what is a sentence that would be sufficient but not greater than necessary to accomplish the sentencing goals.

Here we've got a statute that outlines for us what some of the sentencing factors are that I am required to take into consideration.

The nature and the circumstances of the

offense. I've already said that you went to great lengths to conceal your activities from OfficeMax. Even if one could argue that -- that it appeared to be acceptable under their rules, clearly, the deceit and -- and so forth that I've already addressed that went on in this case suggest otherwise.

And a six-figure loss, you know, to some businesses, to some corporations, that might not be significant. But in the world of courtrooms it is a significant amount of money.

So I do recognize that this is a substantial crime. It went on for some time, and so I have taken into consideration the nature and the circumstances of the offense.

I've talked a little about the history -- your history and characteristics. You've got no criminal history -- again, I'll repeat myself -- no history of violence.

I recognize that your family members have written letters on your behalf that tell me that you are a good and caring member of their family. I -- and I note that you do care for your wife, who has a number of medical issues.

And you have a young son.

You're 39 years old now, which is a little

on the, you know, older side for someone who's in court on a first felony conviction.

I -- and I recognize that in your life you've had squabbles with -- with a number of people.

But in terms of criminal charges and criminal convictions, this is your first.

You have otherwise lived what looks like a law-abiding life, in the sense that you have no prior convictions.

I note that you have a master's degree in electrical and computer engineering, and appear to have a way to earn the money that would be required to pay restitution and the money judgment that I am ordering in this case.

Also in terms of the -- of your history and characteristics, I know that since this case was filed a couple of years -- several years ago, you have had no problems in the way you have conducted your life while on -- while awaiting trial, pretrial, or posttrial, after the jury verdict.

Up to the present day there have been no issues in the way you have conducted yourself.

So that -- all of which suggests to me that a sentence below the guideline range would be sufficient in order to reflect the seriousness of the

offense.

Again, based on what I have seen about your conduct to promote respect for the law and to provide just punishment, I also think that a below sentence -- or a below guideline sentence is sufficient but not greater than necessary to afford adequate deterrence for criminal conduct.

Again, I've seen no problems in the way you have conducted yourself since these charges were filed. You have not been in custody. You have been on -- out of a custody setting on your own recognizance, and I have not been informed of any violations or any issues.

So I -- I think that deterrence is something that can be accomplished with a sentence that is below the guideline range.

To protect the public from further crimes. You know, if -- I recognize that if OfficeMax had not come forth and shut this down, I don't know what would have happened. But based on what we see about what was going on, at least at that point in time, there may have been other victims, other businesses.

As best I can tell, since this was shut down and charges were filed against you, I haven't seen that there have been any -- any other pattern --

similar patterns.

Again, that suggests to me that if -- if you receive a below guideline sentence, that would be sufficient to protect the public from any further crimes that you might commit.

I've considered the kinds of sentences that are available.

I've considered the sentencing guideline range established here.

And taking everything into consideration that I've just mentioned, I do believe a custodial sentence is appropriate in this case.

What I am contemplating is a sentence of 12 months and a day. And so that's what I am contemplating.

And I am contemplating restitution.

We've talked about the civil forfeiture.

And so if anybody has any comment, I'm happy to hear from you.

MR. ROBERT: I have no comment, other than what we've already talked about, Your Honor.

THE COURT: All right.

MS. MESSEC: Nothing beyond what we've already raised.

THE COURT: All right.

Well, with that, then, I will proceed to pronounce sentence.

All right. Now, the Court has adopted the presentence report factual findings.

The Court has considered the sentencing guideline applications and the factors that are set forth in 18 United States Code, Section 3553(a)(1) through (7).

The offense level is 23 and the Criminal History Category is I.

The guideline imprisonment range is 46 to 57 months.

Now the Court has considered the factors raised in 18 United States Code, Section 3553, and the Court has gone through the various factors that the Court has considered.

And so I won't repeat them here once again, but the Court has considered the factors that are set forth in the statute, and the Court has concluded that a variance is appropriate in this case.

Again, the Court has considered that the defendant is 39 years old.

The defendant has no prior criminal history -- has no other criminal history.

The defendant has no history of violence.

The defendant has no history of drug offenses.

The defendant is an educated man with a master's degree in electrical and computer engineering and would have the capacity to pay the financial obligations that the Court will require.

The Court notes that his family has supported him and has written letters on his behalf.

And the Court notes that he is married to his co-defendant, and his co-defendant suffers from a number of physical ailments as well as some anxiety and posttraumatic stress disorder, and the defendant provides her with care and assistance.

The Court has also noted that since the defendant has been facing these charges, that he has not committed any other infractions, and that includes the time post-conviction that he was awaiting his -- his sentencing hearing.

So after consideration of -- of these factors and everything that I mentioned previously, the Court finds that a variance is appropriate.

The Court notes the defendant and the co-defendant fraudulently obtained $105,191 from OfficeMax.

So as to each of Counts 1, 3, 5, 6, and 7

of indictment 1:13-CR-00966-001-JCH, the Defendant Matthew Channon is committed to the custody of the Bureau of Prisons for a term of 12 months and one day. Said terms will run concurrently.

The defendant is placed on supervised release for a term of two years as to each count. Said terms shall run concurrently.

The defendant must comply with the standard conditions of supervision and the following mandatory conditions.

The defendant must cooperate in the collection of DNA as directed by statute.

The following special conditions will also be imposed.

The defendant must submit to a search of the defendant's person, property, or automobile under the defendant's control to be conducted in a reasonable manner and at a reasonable time for the purpose of detecting illegal contraband and to monitor his computer at the direction of the probation officer.

The defendant must inform any residents that the premises may be subject to a search.

And this condition is imposed due to the nature of the instant offense and also based on the

defendant's knowledge of the computers and the internet.

The defendant must not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

And this condition is imposed because the defendant is now a convicted felon.

The defendant is prohibited from incurring new credit charges, opening additional lines of credit, or negotiating or consummating any financial contracts without the prior approval of the probation officer.

The defendant must provide the probation officer access to any requested financial information, personal income tax returns, authorization for the release of credit information, and any other business or financial information in which the defendant has an interest or control.

The Court is imposing these conditions because of the amount of the restitution that will be owed by the defendant.

Now, this condition will also ensure that any additional income will be put towards restitution.

The defendant shall consent to the

United States probation office conducting periodic unannounced examinations of the defendant's computers, hardware and software, which may include retrieval and copying of all data from the defendant's computers.

This also includes the removal of such equipment, if necessary, for the purpose of conducting a more thorough inspection.

The defendant shall not make any changes to the defendant's computer services, user identifications, or passwords without the prior approval of the probation officer.

The defendant must consent, at the direction of the United States probation office, to having installed on the defendant's computers any hardware or software systems to monitor the defendant's computer use.

Monitoring will occur on a random and/or regular basis, and the defendant must warn any others of the existence of the monitoring software placed on the defendant's computer.

And the Court is imposing these conditions based on the nature of the instant offense.

The defendant participated in creating multiple accounts in furtherance of a fraudulent

scheme, so these conditions will assist the defendant in maintaining a law-abiding life.

Now pursuant to the mandatory Victim Restitution Act, it is further ordered that the defendant will make restitution to Office Depot in the amount of $96,278.

And again, that's in recognition of the loss of $105,191, less the value of the inkjet cartridges that were sold to OfficeMax.

Restitution shall be submitted to the clerk of the Court, attention intake, at 333 Lomas Boulevard, Northwest, Suite 270, Albuquerque, New Mexico 87102.

It will then be forwarded to the victim.

The restitution will be paid fully, jointly, and severally with the co-defendant, Brandi Channon.

However, if the defendants are unable to make immediate full restitution, Defendant Matthew Channon shall pay no less than $200 per month, or no less than 10 percent of his gross monthly household income, whichever is greater.

Now, the Court has considered the payment of a fee -- excuse me -- of a fine. But the Court declines to order a fine based on both the defendants

lack of financial resources and also his obligations, both to Office Depot and the forfeiture side, and also the money judgment.

And I said forfeiture. I meant restitution. So the restitution to OfficeMax, and then also the forfeiture issue.

So -- and I do note that the defendant is -- is represented by counsel that suggests that his financial resources are not available to pay a fine, so the Court will not order a fine.

The defendant shall pay a special assessment of $100 as to each count of conviction, for a total of $500, which is due immediately.

The Court finds that the defendant is neither a flight risk nor a danger to the community, so that voluntary surrender will be granted.

The defendant shall report to the United States Marshal Service immediately following sentencing to arrange for self-surrender to the designated facility or to the United States Marshal Service within 60 days from this date, or as otherwise notified by the United States Marshal Service.

Pursuant to 18 United States Code, Section 3742(a), within 14 days of the entry of

judgment you have the right to appeal the final sentence of this Court.

You have the right to apply for leave to appeal in forma pauperis if you are unable to pay the cost of an appeal.

And I need to also make sure that everybody understands that the Court's sentencing order will include a forfeiture award, and the forfeiture award is $105,191.

And to the extent that one of your conditions of supervision will be that you are not allowed to associate with any convicted felons, I will tell you that that does not apply to your wife, who is a convicted felon. So you will be allowed to associate with your -- with your wife. But anybody else is off limits unless the probation office determines that it's appropriate.

And I think there was something else that I'm not remembering.

Is there anything else?

MS. MESSEC: Only that if the defendant has any objections to any of the mandatory standard or special conditions of supervised release, I would like to get those on the record now.

MR. ROBERT: I don't know of any at this

point, Your Honor.

THE COURT: Okay. All right.

MR. ROBERT: I do have a couple of requests.

THE COURT: Okay. Go ahead.

MR. ROBERT: I would ask that Your Honor recommend the Florence, Colorado, facility as the place for service of sentence.

THE COURT: Is there a reason that maybe the Bureau of Prisons would find persuasive?

MR. ROBERT: My guess is that Mr. Channon is going to qualify for a camp. There's a camp there, and it's close to his family.

THE COURT: All right. So the Court will recommend that the sentence be served at Florence so that the defendant can be as close to family as possible, and also to benefit from the -- whatever the camp program might be that they have there.

MR. ROBERT: I would ask that Your Honor consider suspending interest on the restitution order.

THE COURT: Given the size of the restitution order, I'm -- I don't know if you have any comment on that.

I'm inclined to suspend any interest, just

in the interest of getting this addressed and paid. But...

MS. MESSEC: I think to make the victim fully whole they should be entitled to interest. And I do think that they are already receiving about 8-, $9,000 too little on restitution because of the factoring of the ink cartridges.

And I understand that's the Court's decision, but I would -- I think that they should get every cent that they're entitled to, which would include interest on the restitution owed.

THE COURT: All right. Anything else?

MR. ROBERT: No, Your Honor.

I just -- my idea is to make -- let's get this done as quickly as possible.

THE COURT: You know, I don't have any information as to how much money we're talking about or how long. I mean, how long it would take to get this paid.

I know that the fact is you're going to be in prison for at least a while, depending on what happens on your appeal. And -- but I -- I will grant the defendant's request to waive any interest.

MR. ROBERT: Thank you, Your Honor.

The last thing is -- and this is a concern

that I raised in one of the pleadings regarding forfeiture.

The Court has indicated its intention to enter a money judgment against Mr. Channon for $105,191.

The Court has ordered a payment schedule with respect to restitution, but that could be completely subverted by the entry of a judgment that's immediately executable against Mr. Channon.

That would mean that the government gets to collect whatever it can get from Mr. Channon as soon as it can get it, and potentially not only damage Office Depot's opportunity to recover, but also put Mr. Channon at risk of not being able to comply, because he wouldn't be able to pay $200 a month if the government takes every cent that they can get their hands on based on the forfeiture order.

I think -- one of the things that I suggested was make it a part of your ruling that the forfeiture order will only be executed once restitution is paid.

THE COURT: Do you have any comment, Ms. Messec?

MS. MESSEC: Your Honor, I don't think the Court has any authority to do what Mr. Robert is

asking. We -- we responded in writing to this same suggestion in the -- either the sentencing memo or the objections to the PSR or the forfeiture motion.

And I will say that it is the normal practice of the United States to direct moneys collected for forfeiture towards restitution to a victim when that restitution is still outstanding. That decreases the whole amount that the defendant is liable for. It doesn't get doubly deducted.

And so I expect that that's what will happen in this case. I can't make any promises. That's somebody else's decision, but that's the normal way that it happens.

And so usually what Mr. Channon was suggesting through counsel is not going to happen. It's not going to be a problem.

But that execution of the money judgment is in the discretion of the executive branch, and I don't believe that the Court has the authority to put any restrictions on it.

MR. ROBERT: I would suggest that the Court has every authority to fashion a judgment as the Court sees fit.

And to the extent that a money judgment and forfeiture is basically, give me $105,000 right now,

I'll take that pen.

I mean, the government's made some suggestion that it might not do that, and that it might take money that it gets in forfeiture and apply it to restitution, that's lovely, but it's not a commitment. It's certainly not guaranteed.

And so I think that the Court has fashioned a reasonable payment plan with respect to restitution, but having an immediately executable judgment subverts the whole process.

I think the Court has the authority to order restitution -- order forfeiture, but also to order the manner in which the forfeiture is to be paid.

THE COURT: All right. Well, I did look at that issue when it was first addressed in one of the motions, and I concluded that I did not have discretion to order that one be held in abeyance until -- well, not held in -- that the forfeiture wouldn't be collected upon until restitution was paid.

I don't think I have that authority, so I'm going to deny the request.

MR. ROBERT: I don't want anything I just said to subvert the argument that I made that we

oppose the imposition of forfeiture at all.

THE COURT: Understood. And I think your record is clear.

MR. ROBERT: All right.

THE COURT: So was that everything? Did we...

MR. ROBERT: I think so, Your Honor.

THE COURT: All right. Well, the Court will order sentence imposed as stated.

And I will look for a money judgment -- or a judgment on the forfeiture.

So thank you-all for your appearances today. We'll be in recess.

(Proceedings concluded at 1:11 p.m.)

# CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Date: October 24, 2016

PAUL BACA, RPR, CCR
Certified Court Reporter #112
License Expires: 12-31-16